# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-1089

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | *   Appeal from the United States |
| v. | *   District Court for the |
| | *   Western District of Missouri. |
| William J. Olson, | * |
| | * |
| Appellant. | * |

_____

Submitted: November 19, 2010
Filed: July 20, 2011

_____

Before WOLLMAN, BYE, and SHEPHERD, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

William Olson pleaded guilty to being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). At sentencing, the government argued, among other things, that Olson's conduct during his arrest amounted to an assault on the arresting officers and therefore justified a six-level increase to his base offense level. See U.S. Sentencing Guidelines Manual § 3A1.2(c)(1) (2008). The district court[1] agreed, calculated a guidelines range of 130 to 162 months' imprisonment, and sentenced Olson to 120 months' imprisonment, the maximum term permitted by statute.

_____

[1]The Honorable Gary A. Fenner, United States District Judge for the Western District of Missouri.

See 18 U.S.C. § 924(a)(2). Olson appeals, arguing that the six-level increase was inappropriate. We affirm.

I.

In the early morning hours of October 17, 2008, two Lee's Summit, Missouri, police officers—responding to a call about a possible burglary in progress—approached a detached garage on a quiet residential street. They could hear someone inside. One of the officers, Vincent Grisafe, radioed for additional help and, shortly thereafter, Officer Crume arrived. Crume had just been in the parking lot of a nearby school where someone had left a truck with an empty gun holster inside. The three officers suspected that the truck, the holster, and the gun to go with it belonged to whoever was inside the garage.

As the three officers were arranging themselves around the garage, its door flew open and Olson ran out. The officers told him to stop and ordered him to the ground, but Olson ignored them and kept running. After a short chase, Olson was nowhere in sight.

Not ready to give up the search, Grisafe radioed for the help of a canine team to track Olson. Twenty minutes later, Officer Justin Rigot arrived with his dog, Bessie. Rigot pointed Bessie to some footprints in the dew on a nearby field, where Bessie found a scent trail. Following that trail, she led the officers to a nearby creekbed, where she found and "engage[d]"[2] Olson.

Rigot, who was following closely behind, would later testify that as he "peer[ed] over the edge of the creek . . . [he] saw [Olson] laying in the creek wearing

---

[2]This appears to be a euphemism for growling, biting, and other unpleasantness. Sentencing Tr. at 26:10-11, 27:21-22.

-2-

a dark-hooded sweatshirt." Sentencing Tr. at 26:13-16. He described Olson's physical position as "an ambush position which I can describe to you [as] maybe a fetal position. His back was towards me. He was laying in the creek bed with his hands between his knees, and he was looking up at the opposite side of the creek bed which was the original direction we were coming from." Id. at 26:19-24. He further testified that Olson "was holding a gun in his hand and he had it clasped with both his hands like in a firing hold." Id. at 27:1-4.

Grisafe, who had been walking with Rigot, also testified that Olson's "back was up against the bank of the creek facing away from us and he was kind of in a fetal position." Id. at 13:20-21. And Grisafe, too, "saw that [Olson] had a gun in between his legs and he was grasping it with both hands." Id. at 14:5-7. Grisafe estimated that at this point the officers were only three or four feet away from Olson.

Grisafe, Rigot, and a third officer who had since arrived identified themselves as police officers and "gave repeated verbal commands for [Olson] to drop the gun." Id. at 27:6-7. When asked how many times they repeated the command, Rigot testified, "Numerous, numerous times, and it was so loud that officers on the perimeter that were approximately 50 yards away, they heard this yelling." Id. at 27:9-12. But Olson did not drop the gun. Rather, for "the first couple minutes he laid there motionless even as the dog bit him. He didn't move. He didn't say nothing." Id. at 27:21-24.

It was only when additional officers approached that Olson began to move, in a way that Rigot described as "preparing to get a stance to shoot somebody." Id. at 28:12. Specifically, he testified that he watched Olson "start[] to move his, would have been right leg and he's bringing the gun up around like this as if he's to get a stance," id. at 28:7-9, and that it appeared Olson "was bringing the gun up from between his knees," id. at 32:9. Grisafe testified that he, too, saw "[t]he gun start[] to rise." Id. at 15:2.

-3-

Grisafe and Rigot both fired their duty weapons at Olson, hitting him several times. Grisafe later acknowledged that it "was a very stressful situation" and could not remember firing his weapon; his next memory was of calling for an ambulance. Rigot remembered firing his weapon four times.

Olson was treated for his injuries and later pleaded guilty to being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). As recounted above, the government argued at sentencing that Olson's conduct during his arrest amounted to an assault on the arresting officers and therefore justified an enhancement under guidelines § 3A1.2(c)(1), the "Official Victim" enhancement. The district court, crediting the officers' testimony, concluded that Olson had assaulted the officers and applied the enhancement.

On appeal, Olson argues that application of the enhancement was procedural error because the officers' testimony at sentencing was insufficient to support the conclusion that he had assaulted the officers. He asks us to vacate his sentence and remand the case to the district court for resentencing.

II.

"This court reviews the district court's construction and application of the sentencing guidelines de novo, and we review its factual findings regarding enhancements for clear error." United States v. Bastian, 603 F.3d 460, 465 (8th Cir. 2010) (citation and quotation marks omitted). "The government must prove the facts needed to support a sentencing enhancement by a preponderance of the evidence." United States v. Hansel, 524 F.3d 841, 847 (8th Cir. 2008).

Olson does not challenge the accuracy of the officers' testimony, but instead argues that it was insufficient to support the district court's conclusion that the victim-related enhancement found in guidelines § 3A1.2(c)(1) applies to his conduct. Our

task is therefore limited to answering one question: Was the officers' testimony at sentencing sufficient to support the application of the Official Victim enhancement set forth in § 3A1.2(c)(1)? We consider the question *de novo*.

Section 3A1.2(c)(1) provides for a six-level enhancement to the base offense level for any defendant who, "knowing or having reasonable cause to believe that a person was a law enforcement officer, assaulted such officer during the course of the offense or immediate flight therefrom" and did so "in a manner creating a substantial risk of serious bodily injury." U.S. Sentencing Guidelines Manual § 3A1.2(c)(1). The application note clarifies that the enhancement "applies in circumstances tantamount to aggravated assault . . . against a law enforcement officer, committed in the course of, or in immediate flight following, another offense." Id. § 3A1.2(c)(1) cmt. n.4(A). Section 3A1.2(c) does not, however, define the terms "assaulted" or "aggravated assault." Furthermore, although we have on prior occasions affirmed the application of the Official Victim enhancement, see, e.g., United States v. Hill, 583 F.3d 1075 (8th Cir. 2009), we have never endeavored to determine precisely what constitutes "assault[]" under that guideline.

We join those circuits that have concluded that the term "assault" in the Official Victim enhancement is a reference to common-law criminal assault. Of the circuits that have considered this question, the most complete analysis appears in the First Circuit's decision in United States v. Lee, 199 F.3d 16 (1st Cir. 1999). In Lee, the First Circuit concluded that "generally speaking," "the term 'assault' in the [Official Victim enhancement] should be read as a reference to common law criminal assault." 199 F.3d at 18. Although it acknowledged that the drafters of the guidelines "may not have had this precise question in mind," it settled on the common-law definition because "'assault' is a standard common law concept and no other definition has been adopted by the guideline or commentary, either explicitly or by cross-reference." Id. at 17.

Furthermore, the First Circuit was unable to find a more appropriate alternative definition. Looking first to a federal statute criminalizing assault, the court noted that "assault" was not a defined term, see Lee, 199 F.3d at 16, and we observe that, indeed, a similar federal assault statute has been read to incorporate the common-law definition of assault, see, e.g., United States v. Dupree, 544 F.2d 1050, 1051 (9th Cir. 1976). The First Circuit found similarly unhelpful the commentary to guidelines § 2A2.2, which then, as now, defined "Aggravated Assault" as a particular type of "felonious assault," but left "assault" undefined. See Lee 199 F.3d at 18; see also United States v. Carmichael, 267 F. App'x 290, 292 (4th Cir. 2008) ("The commentary to § 3A1.2 does not define aggravated assault. . . . Carmichael contends that the district court should have applied the definition of aggravated assault set out in Application Note 1 to USSG § 2A2.2 (Aggravated Assault). However, § 2A2.2 is not applicable to Carmichael's offense."); cf. United States v. Sampson, 41 F. App'x 112 (9th Cir. 2002) (rejecting an application of the Official Victim enhancement because none of the aggravating factors listed in § 2A2.2 cmt. n.1 were present).

We agree with the First Circuit that the Sentencing Commission's use of a term well understood at common law, coupled with a lack of appropriate alternative definitions, directs us to apply the term's common-law meaning.[3] Because we are persuaded by the First Circuit's analysis in Lee, and because none of the post-Lee

---

[3]Both Olson and the government provide citation to Missouri's statutory definition of assault, though neither explains why a state-law statutory definition should be applied in this context. Neither the text of, nor the commentary to, § 3A1.2(c)(1) in any way suggests that "assault" is defined by reference to state law and we are disinclined to presume that state law (and particularly a state statute) supplies the answer, especially given "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

amendments to the guidelines affect that analysis, we agree that the term "assault" in § 3A1.2(c) is a reference to common-law criminal assault.[4]

As the First Circuit explained in Lee, "[c]ommon law assault embraces two different crimes: one is attempted battery, that is, an intended effort to cause bodily harm to another which falls short of success . . . regardless of whether the intended victim knows of the attempt." 199 F.3d at 18 (citing 2 Wayne R. LaFave & Austin W. Scott, Jr., Substantive Criminal Law § 7.16(a), at 313-14 (1986)). "The other branch of assault is an act which is intended to, and reasonably does, cause the victim to *fear* immediate bodily harm; such 'menacing' constitutes assault even if no physical harm is attempted, achieved, or intended." Id. (emphasis in original) (citing 2 Wayne R. LaFave & Austin W. Scott, Jr., Substantive Criminal Law § 7.16(b), at 315-17 (1986)).

The court in Lee was unable to rely on the first, "attempted battery," branch because the district court in that case "made no finding that Lee intended to shoot the police officers; and it is not clear that the evidence would readily lend itself to such a finding unless the judge discredited Lee's own statement as to his intent." Id. It therefore proceeded to examine "the scienter requirement for common law

_____

[4]To our knowledge, no published decision of a federal court of appeals has ever rejected this view. The Ninth Circuit, in one unpublished opinion, has expressly adopted it, see United States v. Garcia-Lopez, 49 F. App'x 737, 737-38 (9th Cir. 2002) ("Garcia-Lopez argues there was insufficient evidence of intent to constitute assault under the official victim enhancement, U.S.S.G. § 3A1.2(b). We have interpreted 'assault' to be equivalent to common law assault."), while the Fourth Circuit has selected a similar definition, see United States v. Hampton, 628 F.3d 654, 660 (4th Cir. 2010) (applying the "common," or dictionary, definition of assault for the purposes of § 3A1.2(c)(1), which gave "the same result" as "application of the common law meaning"). Cf. United States v. Maldonado-Quijada, 34 F. App'x 285, 286 (9th Cir. 2002) ("The Guidelines define assault as a 'substantial risk of serious bodily injury,' and do not require that such an assault actually harm an officer.").

['menacing'] assault," id. at 18, ultimately concluding that "mere knowledge of consequences is enough" for application of the Official Victim enhancement, id. at 20. We need not go so far.

Here the district court made a finding about Olson's intent, specifically: That Olson "was making an effort to protect himself against apprehension [by] the officers by use of his weapon." Sentencing Tr. at 42:21-24. Although Olson insists that he never intended to use his weapon against the officers, but was just too cold from lying in the wet creek bed to drop it, we review the district court's factual findings only for clear error. Bastian, 603 F.3d at 465. Considering the circumstances—that Olson had many opportunities to drop his gun but did not, that Olson decided (at least initially) to hold the gun in his hands while he was hiding in the creek bed, that he did not respond to the officers' repeated orders to drop it, but that he instead "br[ought] the gun up from between his knees"—we cannot conclude that this finding was clearly erroneous.

This finding, derived from and combined with the officers' testimony, provides sufficient basis for application of the enhancement. At a minimum, the district court's statement that "[Olson] was making an effort to protect himself against apprehension . . . by use of his weapon," meant that Olson intended to frighten the officers, satisfying the intent element of the common-law definition of "menacing" assault. Furthermore, the officers testified that Olson's movements put them in fear of losing their lives. See Sentencing Tr. at 15:15, 28:10-15. Such fear was reasonable when faced with a fleeing suspect, holding a gun, who had refused to relinquish it and began to raise it as they closed in around him. Accord United States v. Easter, 553 F.3d 519, 524 (7th Cir. 2009) ("[S]imply reaching for a loaded gun is enough to create a

substantial risk of serious bodily injury to another person."). Olson therefore committed, at minimum, a menacing assault on the officers.[5]

Additionally, there is a less charitable reading of the finding that "[Olson] was making an effort to protect himself against apprehension . . . by use of his weapon," which is, of course, that it meant that Olson intended to escape by firing his weapon at the officers. That too would constitute common-law assault, in that case by way of attempted battery. We therefore conclude that sufficient evidence supported the district court's decision to apply the enhancement.[6]

---

[5]Because we conclude that the district court's finding regarding Olson's intent was not clearly erroneous, we need not, and do not, decide whether a mental state falling short of intent to cause fear could satisfy the common-law definition of "menacing" assault for the purposes of § 3A1.2(c). Cf. United States v. Robinson, 537 F.3d 798, 802-803 (7th Cir. 2008) ("Under the most demanding [assault] standard, a defendant must intend to "cause apprehension" or actual "bodily harm." We doubt that such a stringent intent requirement applies to § 3A1.2(c)."); Carmichael, 267 F. App'x at 292 ("[Section 3A1.2] does not . . . require a showing of intent.").

[6]In addition to his claim of procedural error, Olson also raises, in passing, a claim of "substantive error," see Appellant's Br. at 22-23, which he phrases as the district court's failure to "properly consider all the facts and circumstances," "properly balance, or weigh the facts," or come to the correct legal conclusion with respect to the enhancement. But although he couches his complaint as one of substantive unreasonableness, see United States v. San-Miguel, 634 F.3d 471, 475 (8th Cir. 2011) ("A district court abuses its discretion when it fails to consider a relevant factor, gives significant weight to an irrelevant or improper factor, or considers only appropriate factors but nevertheless commits a clear error of judgment."), it plainly is not. Rather, it is further argument that the district court incorrectly determined the facts and their legal sufficiency when it applied the § 3A1.2(c)(1) enhancement—nothing more than a restatement of his now-rejected claim of procedural error.

## III.

The sentence is affirmed.

_____