**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-1020
_____

UNITED STATES OF AMERICA

v.

MEKAIL OMAR JONES,

                                              Appellant

_____

Appeal from the United States District Court
for the Western District of Pennsylvania
(District Court No. 1-11-cr-00042-001)
District Judge: Honorable Sean J. McLaughlin

_____

Argued October 18, 2013

Before:  RENDELL, JORDAN and LIPEZ*, <u>Circuit Judges</u>

(Opinion Filed:  January 10, 2014)
_____

        *Honorable Kermit V. Lipez, Senior United States
Circuit Judge for the Court of Appeals for the First Circuit,
sitting by designation.

Lisa B. Freeland, Esquire
Federal Public Defender
Thomas W. Patton, Esquire  **(Argued)**
Assistant Federal Public Defender
Office of Federal Public Defender
1001 State Street
1111 Renaissance Centre
Erie, PA   16501

       Counsel for Appellant


David J. Hickton, Esquire
United States Attorney
Michael L. Ivory, Esquire  **(Argued)**
Assistant United States Attorney
Rebecca R. Haywood, Esquire
Office of United States Attorney
700 Grant Street, Suite 4000
Pittsburgh, PA   15219

Christine A. Sanner, Esquire
Office of United States Attorney
17 South Park Row, Room A330
Erie, PA   16501

       Counsel for Appellee

## OPINION

**RENDELL**, Circuit Judge:

Defendant Mekail Omar Jones appeals his sentence of 120 months imprisonment following his guilty plea to possession of a firearm by a convicted felon. Jones makes three claims of error by the District Court. First, he argues that his prior conviction for vehicular flight should not have counted as a crime of violence under the sentencing guidelines. Second, Jones contends that his conduct in this case did not support a guideline enhancement for assault on a police officer. Third, he states that the District Court erred by presuming his guidelines range to be reasonable, ignoring arguments made by his defense counsel.

For the reasons that follow we will affirm in part, and reverse in part, the District Court's judgment of sentence.

## I.

On the afternoon of April 27, 2011, uniformed City of Erie police officers Ryan Onderko and Gregory Baney responded to a disturbance call at a bar located at Parade and 11th Streets in Erie, Pennsylvania. As the officers approached the bar in their marked police cruiser, they spotted an individual, later identified as Jones, running from the bar.

Officer Onderko was familiar with Jones from a prior arrest, as described below, and both officers were aware that Jones had an outstanding arrest warrant. As the police cruiser approached, Jones stopped running and began walking, and Officer Onderko was then able to recognize him. Officer Onderko exited the car and said, "hey, Jones, come here." (App. 258.) Jones then "took off running" toward 12th Street and Officer Onderko pursued him on foot, "yelling several times, 'stop you're under arrest.'" (*Id.*) The foot-chase that ensued saw Jones lead Officer Onderko across traffic on 12th Street before heading back in the direction where the chase began.

As Officer Onderko closed in, he could tell that Jones was reaching or digging in his waistband, but could not discern what Jones was reaching for. (App. 259.) Officer Baney parked the police cruiser, exited and began to pursue Jones as well. As Jones fled back towards the parking lot where the chase had begun, Officer Baney observed Jones retrieve a handgun from his waistband while he was "no more than . . . two parking spots" away. (App. 218.) Officer Onderko then caught up to Jones and tackled him from behind. At that moment, Officer Baney shouted, "Gun!" and the handgun flew out of Jones's hand. (App. 219.) In tackling Jones, Officer Onderko suffered a complete tear of his anterior cruciate ligament. Yet Jones managed to escape and continue fleeing. Officer Baney grabbed Jones's shirt, but Jones slipped out of his shirt and again continued to run. Officer Baney then shot Jones with his taser from a distance of 30-40 feet three times, finally subduing Jones.

Police later recovered the firearm that Jones had removed from his waistband, a Smith & Wesson .38 caliber

handgun.  In a post-arrest statement, Jones, a convicted felon, admitted that he was carrying the gun.  Jones was subsequently charged with, and pleaded guilty to, one count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1).

The Presentence Report ("PSR") calculated Jones's base offense level to be 24, pursuant to U.S.S.G. §2K2.1(a)(2), because Jones had previously been convicted of two "crimes of violence": conspiracy to commit robbery, and fleeing or attempting to elude law enforcement.  Jones objected, arguing that fleeing or attempting to elude was not a crime of violence.  (App. 47.)

This prior conviction was for a second degree misdemeanor charge of  "Fleeing or Attempting to Elude [a] Police Officer" under Pennsylvania law, 75 Pa. Cons. Stat. § 3733.  The relevant language of the statute is as follows:

> Offense defined.--Any driver of a motor vehicle who willfully fails or refuses to  bring his vehicle to a stop, or who otherwise flees or attempts to elude a pursuing police officer, when given a visual and audible signal to bring the vehicle to a  stop, commits an offense as graded in subsection (a.2).

The "grading" provision makes this offense a misdemeanor of the second degree, unless, while "fleeing or attempting to elude a police officer," the driver (1) drives under the

5

influence of alcohol or a controlled substance, or (2) crosses a state line, or (3) "endangers a law enforcement officer or member of the general public due to the driver engaging in a high-speed chase." 75 Pa. Cons. Stat. § 3733(a.2)(i)-(iii). In that event, the offense is a third-degree felony.

The District Court first took note of several cases which had held that vehicular flight is categorically a crime of violence, as well as a non-precedential opinion of our Court in which we held that a conviction for vehicular flight under Pennsylvania law constituted a crime of violence. (App. 298-300) (citing *United States v. Jackson*, 495 F. App'x 224 (3d Cir. 2012).

However, the District Court did not resolve whether misdemeanor vehicular flight pursuant to 75 Pa. Cons. Stat. § 3733(a)(1) categorically constitutes a crime of violence under the sentencing guidelines. Instead, the District Court looked at the records of Jones's conviction and concluded, "the factual conduct attributed to the defendant in the criminal information . . . and agreed to by the defendant during his colloquy is consistent with that attributed to the defendant in the Third Circuit's decision in *Jackson* and would support an application of the enhancement pursuant to a modified categorical approach." (App. 301.) The District Court then recounted that "during the [plea] colloquy, the defendant admitted to backing his vehicle into Officer Onderko's attended vehicle, engaging in a high speed chase, and failing to stop for multiple stoplights and stop signs. In addition, he admitted to striking a fence and driving onto a lawn." (App. 10-11.) Thus, the District Court concluded that Jones's prior conviction for fleeing and eluding was a crime of violence and overruled his objection.

The Government also objected to the PSR, urging that an additional six-level increase pursuant to U.S.S.G. § 3A1.2(c)(1) was warranted, because Jones assaulted Officer Onderko during the foot-chase. Jones objected to this enhancement. The District Court sustained the Government's objection, concluding that reaching for a loaded gun is enough to produce a substantial risk of serious bodily injury, thereby warranting the six-level enhancement.

Toward the conclusion of sentencing, the District Court addressed defense counsel's request for a variance, inquiring as to the factors that would support a sentence below the guidelines range. The Court also engaged in a colloquy with defense counsel concerning his argument that it did not promote respect for the law to enhance Jones's sentence to the statutory maximum based on uncharged conduct.

In calculating the final guidelines range, pursuant to § 2K2.1(a)(2), the District Court utilized the base offense level of 24 based on two prior convictions for crimes of violence. The Court then added four levels for an enhancement under § 2K2.1(b)(6)(B), not at issue here, for the possession of a firearm in connection with resisting arrest. Subtracting three levels for acceptance of responsibility, the offense level stood at 25 with a criminal history category III, corresponding to an imprisonment range of 70 to 87 months. Then, the subsequent addition of six levels for "assault" on Officer Onderko pursuant to § 3A1.2(c)(1) led to a new total offense level of 31, for an imprisonment range of 135 to 168 months. However, the statutory maximum time of imprisonment was ten years, so that pursuant to § 5G1.1(c), 120 months became Jones's guidelines range. The District Court accordingly

7

sentenced Jones to 120 months' imprisonment.  In so doing, the District Court declined to grant a downward variance.

## II.

The District Court had jurisdiction over this case under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291.

Determination of what constitutes a crime of violence under the sentencing guidelines, and legal interpretations of the guidelines, are both subject to plenary review.  *United States v. McQuilkin*, 97 F.3d 723, 727 (3d Cir. 1996).  Factual findings pertaining to sentencing are reviewed for clear error, and we review application of the guidelines to the facts for abuse of discretion.  *Id.*; *United States v. Blackmon*, 557 F.3d 113, 118 (3d Cir. 2009).  We review procedural error for abuse of discretion, but if an appellant fails to raise a contemporaneous objection below, we will review for plain error.  *United States v. Russell*, 564 F.3d 200, 203 (3d Cir. 2009).

As noted above, Jones raises three separate claims of error concerning his sentence: (1) that the District Court erred in determining that his vehicular flight conviction constituted a crime of violence under the guidelines, (2) that the District Court erred in imposing a six-level enhancement for assaulting the police, and (3) that the District Court improperly presumed the applicable sentencing guidelines to be reasonable, while ignoring defense counsel's arguments. We address each of these claims in turn.

1.    Vehicular Flight - Crime of Violence

Under U.S.S.G. § 2K2.1(a)(2) a defendant's base offense level is 24 if the instant offense was committed after at least two felony convictions involving a "crime of violence."  A crime of violence is defined in § 4B1.2(a)(1)-(2) as :

> any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that-- (1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or (2) is burglary of a dwelling, arson, or extortion, involves the use of explosives, or *otherwise involves conduct that presents a serious potential risk of physical injury to another*.

(emphasis added).  Because the Pennsylvania crime defined above does not have as an element the use of physical force, and is not listed as an enumerated offense, the issue in this case is whether Jones's conviction for misdemeanor vehicular flight qualifies as a crime of violence pursuant to the final, residual clause of § 4B1.2(a)(2).

In making this determination, courts are required to follow the "categorical approach," wherein the crime of conviction is evaluated as to whether it categorically constitutes a crime of violence.  "That is, we consider

9

whether the *elements of the offense* are of the type that would justify its inclusion within the residual provision, without inquiring into the specific conduct of this particular offender." *James v. United States*, 550 U.S. 192, 202 (2007) (emphasis in original).[1] Thus, in the ordinary case involving the residual clause, the categorical approach calls for a straightforward procedure: determining whether the elements of the statute of conviction categorically "involve[] conduct that presents a serious potential risk of physical injury to another." *See* § 4B1.2(a)(2); *see also Sykes v. United States*, 131 S. Ct. 2267 (2011) (applying the categorical approach to determine if vehicular flight constitutes a crime of violence under the residual clause of the Armed Career Criminal Act ("ACCA")).

The Supreme Court has recently spoken as to when we can look beyond the fact of conviction and examine certain record evidence, in determining whether the conviction constitutes a crime of violence. In *Descamps v. United States*, 133 S. Ct. 2276 (2013), the Court held that only where the conviction involves a divisible statute, containing multiple alternate elements, where it may be impossible to conclude which statutory provision was the basis for the conviction, is

---

[1] *James* concerned the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924 (e)(1), which mandates a minimum of fifteen years imprisonment if a defendant has three prior convictions for a "violent felony." 550 U.S. at 195. However, "the definition of a violent felony under the ACCA is sufficiently similar to the definition of a crime of violence under the Sentencing Guidelines that authority interpreting one is generally applied to the other . . . ." *United States v. Hopkins*, 577 F.3d 507, 511 (3d Cir. 2009) (footnote omitted).

the sentencing court permitted to investigate the record beyond the fact of conviction. Pursuant to this "modified categorical approach," a court may consult extra-statutory documents such as the "charging document, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented." *Shepard v. United States*, 544 U.S. 13, 16 (2005). As the Supreme Court emphasized in *Descamps*:

> the modified approach merely helps implement the cat egorical approach when a defendant was convicted of violating a divisible statute. The modified approach thus acts not as an exception, but instead as a tool. It retains the categorical approach's central feature: a focus on the elements, rather than the facts, of a crime. . . . All the modified approach adds is a mechanism for making that comparison when a statute lists multiple, alternative elements, and so effectively creates "several different . . . crimes."

*Descamps*, 133 S. Ct. at 2285 (quoting *Nijhawan v. Holder,* 557 U.S. 29, 41 (2009)).

Thus, only if the Pennsylvania statute effectively creates several different crimes, such that it, "renders opaque which element played a part in the defendant's conviction,"

should the court resort to the modified categorical approach. *Id*. at 2283. This approach should be followed if certain elements of the statute fit within the definition of a crime of violence, while other alternative elements do not. In that event, the court would need to know which elements were the basis for the defendant's conviction, and the court may examine *Shepard* documents to make that determination. *See id.* 2285 ("If at least one, but not all of those crimes [in a given statute] matches the generic version, a court needs a way to find out which the defendant was convicted of.")

While it could be argued that the Pennsylvania statute in question is a divisible one, given the clauses separated by "or," Jones's conviction does not require further examination under the modified categorical approach. That is because it matters little whether Jones intentionally "fail[ed] or refus[ed] to bring his vehicle to a stop," or "otherwise fle[d] or attempt[ed] to elude" law enforcement, after being ordered to stop. 75 Pa. Cons. Stat. § 3733(a). All of the listed conduct involves the same type of intentional disobedience of a command from law enforcement while in a vehicle. As such, all of the listed conduct is of the same nature, that either would or would not collectively fit under the definition of a crime of violence. Thus, for purposes of our analysis, the statute creates one crime of willfully fleeing from law enforcement, and we need not resort to the modified approach.

While it may be tempting to examine the conduct underlying a given conviction, as the District Court did, the Supreme Court now says we cannot. Indeed, until only recently we sometimes employed the modified categorical approach in a way that may have implied its use was not so

12

limited. *See United States v. Marrero*, 677 F.3d 155, 159 (3d Cir. 2012) (examining underlying conduct without determining threshold question of whether the statute is divisible such that some combinations of elements would be a crime of violence and some would not), *judgment vacated*, 133 S. Ct. 2732 (2013). However, we are bound by the holding of *Descamps*, which makes clear that use of the modified categorical approach is restricted to determining the crime of conviction from divisible statutes, in which certain proscribed conduct fits within the definition of a crime of violence, and other conduct does not.

Under *Descamps*, the District Court erred, although perhaps understandably given some of our prior case law, by engaging in a factual analysis in determining whether Jones's conviction was a crime of violence. The Court recounted that "during the [plea] colloquy, the defendant admitted to backing his vehicle into Officer Onderko's attended vehicle, engaging in a high speed chase, and failing to stop for multiple stoplights and stop signs. In addition, he admitted to striking a fence and driving onto a lawn." (App. 10-11.) The Court accordingly concluded that the "defendant's prior conviction of fleeing and attempting to elude police is a crime of violence . . . ." (App. 11.) As courts may only utilize the modified categorical approach where the court needs to determine the statutory basis for the defendant's conviction, we now view this factual inquiry as improper.

The Government contends that the Court did not err because it did not utilize the modified approach, or because the factual analysis constituted an alternative holding. Both arguments are meritless. First, the District Court specifically stated that it could apply the enhancement "pursuant to a

13

modified categorical approach," before proceeding to cite the conduct of the defendant during the car chase. (App. 10.) Second, although the District Court noted that "various Circuit Courts which have considered the question have determined that vehicular flight categorically involves a potential risk of serious injury," the District Court did not rely on such authority to reach a similar conclusion. (App. 7.) Rather, the District Court relied on the "factual conduct attributed to the defendant in the criminal information and agreed to by the defendant during his colloquy," to conclude that Jones had committed a crime of violence under the guidelines. (App. 10.) As an improper use of the modified categorical approach, this was error, and would normally require us to remand for resentencing on this basis.[2]

However, the District Court's error may be harmless if Jones's misdemeanor flight conviction nonetheless qualifies categorically as a crime of violence. *See United States v. Taylor*, 630 F.3d 629, 635 (7th Cir. 2010) (finding improper use of modified categorical approach harmless where the "district court reached the correct conclusion" in determining a conviction to be a crime of violence). The Supreme Court spoke to this issue in *Sykes*, 131 S. Ct. 2267, holding that an offense under the Indiana vehicular flight law was a violent felony under the residual clause of the ACCA. The Indiana statute generally prohibited "knowingly or intentionally . . .

---

[2] Because we find the District Court erred in looking to the factual conduct underlying the flight conviction, we need not address Jones's further argument that the District Court also erred by reciting facts alleged in separate counts of the state court information and stated in other counts of the plea colloquy.

flee[ing] from a law enforcement officer after the officer has, by visible or audible means, identified himself and ordered the person to stop." *Id.* at 2271 (quoting Ind. Code 35-44-3-3(a)(3)). The statute contained multiple distinct offenses, including: (1) engaging in flight while using a vehicle, and (2) engaging in flight while "operat[ing] a vehicle in a manner that creates a substantial risk of bodily injury to another person." *Id.* (quoting Ind. Code 35-44-3-3(b)(A)-(B)(1)). Both of these offenses were graded as "Class D" felonies under Indiana law. *Id.*

In *Sykes*, the defendant argued that because he was convicted under the simple vehicular flight provision, and not the aggravated counterpart, his conviction necessarily did not involve a substantial risk of violence, and thus did not constitute a violent felony. *Id.* at 2276. The Supreme Court rejected this argument, relying in part on the fact that both the simple and aggravated offenses were graded as Class D felonies, reflecting a legislative judgment that both types of violations significantly risked violence. *Id.* Jones urges here that, because in *Sykes* both crimes were felonies and his offense is only a misdemeanor, *Sykes* requires a finding in his favor.

Admittedly, the statute in this case sets forth both a misdemeanor and a felony. It is a second-degree misdemeanor for a driver to "willfully fail[] or refuse[] to bring his vehicle to a stop, or . . . otherwise flee[] or attempt[] to elude a pursuing police officer, when given a visual and audible signal to bring the vehicle to a stop . . . ." 75 Pa. Cons. Stat. § 3733(a). However, vehicular flight is a third-degree felony if it also "endangers a law enforcement officer or member of the general public due to the driver engaging in

15

a high-speed chase . . . ." *Id.* § 3733(a.2)(2)(iii). Jones was initially charged with the third-degree felony provision, but later pled to a second-degree misdemeanor violation of the statute.

The *Sykes* Court took note of this precise situation, where "a crime is a lesser included offense . . . in cases where that offense carries a less severe penalty than the offense that includes it." 131 S. Ct. at 2277. However, the Court stated it was not deciding whether such a lesser-graded offense would also constitute a violent felony. *Id.* Thus, we are left without specific guidance as to whether the fact that Jones's conviction was a misdemeanor matters in determining whether it is a crime of violence.

Even without such guidance, however, we reject the notion that the misdemeanor versus felony distinction is controlling here. The language of the misdemeanor provision, as noted above, prohibits willfully fleeing from law enforcement in a vehicle. The language of the *Sykes* court was unequivocal in describing the significant risks associated with intentional vehicular flight. The Court explained that "[e]ven if the criminal attempting to elude capture drives without going at full speed or going the wrong way, he creates the possibility that police will, in a legitimate and lawful manner, exceed or almost match his speed or use force to bring him within their custody. A perpetrator's indifference to these collateral consequences has violent—even lethal—potential for others." *Id.* at 2273. In support, the Court cited numerous statistics showing the high rate of crashes and injuries which result from car chases with police, and the relatively lower risk of violence associated with

16

burglary and arson, which are enumerated in the ACCA as violent felonies. *Id*. at 2274-75.

Our sister circuit courts who have addressed this situation have uniformly held that lesser, lower-graded flight offenses are violent felonies under the ACCA (or crimes of violence under the guidelines). In response, Jones argues that the statutes in those cases contained narrow aggravated flight provisions, such that the lesser flight counterparts still encompassed substantially risky crimes. For instance, Jones points out that in *United States v. Doyle*, 678 F.3d 429, 432 (6th Cir. 2012), Tennessee's aggravated flight law only applied where "the flight or attempt to elude creates a risk of death or injury to innocent bystanders or other third parties," such that the simple flight provision at issue still encompassed flights which posed a risk to pursuing police officers. Further, in both *United States v. Hudson*, 673 F.3d 263 (4th Cir. 2012), and *United States v. Petite*, 703 F.3d 1290 (11th Cir. 2013), the Courts of Appeals found Florida's lesser-included flight statute to be a violent felony, noting that the aggravated flight provision criminalized only those flights involving high-speed chases, such that the lesser provision covered still-risky lower-speed chases. By contrast, Jones urges that the Pennsylvania aggravated flight provision is very broad, encompassing risk to police officers, third parties, and lower-speed chases, so that misdemeanor flight under Pennsylvania law must relate to conduct that does not involve substantial risk, and thus cannot constitute a crime of violence under the sentencing guidelines.

While Jones's characterization of these cases is accurate to a point, those courts were also guided, as we are, by the unambiguous language of *Sykes* concerning the danger

posed by vehicular flight. For instance, the Eleventh Circuit noted that "[t]he Supreme Court could not have been clearer in concluding that vehicle flight from a law enforcement officer is an extraordinarily risky enterprise . . . ." *Petite*, 703 F.3d at 1296-97. Similarly, the Fourth Circuit recognized that "intentional vehicular flight *in any manner* poses a potential level of risk that is sufficient to render the offense a violent felony." *Hudson*, 673 F.3d at 268 (emphasis in original); *see also Doyle*, 678 F.3d at 435 (finding that in vehicular flight, the "expected confrontation between suspect and police officer places property and persons at serious risk of injury.") Thus, while these courts were properly concerned with the differentiation between the grades of offenses in the statutes at issue, they also were mindful of the profound risks which are part and parcel of intentional flight from the police, as detailed in *Sykes*.

And, the language of the Pennsylvania misdemeanor provision itself rebuts Jones's contention that it would involve only non-dangerous conduct. Indeed, it encompasses exactly the type of conduct *Sykes* considered, intentional flight. The felony of aggravated flight, 75 Pa. Cons. Stat. § 3733(a)(2)(iii), encompasses flight which "endangers a law enforcement officer or member of the general public due to the driver engaging in a high-speed chase." The Pennsylvania Superior Court opinion *In re R.C.Y.*, relied upon by Jones, states that "the legislature included this term [high-speed chase] to indicate that the enhanced penalties applied only in cases where the defendant's actions created an extraordinary danger to the public at large or to police officers." 27 A.3d 227, 230 (Pa. Super. Ct. 2011). Thus, while the felony provision is aimed at extraordinary danger, the misdemeanor provision nonetheless encompasses the

18

danger inherent in willful flight from, or eluding of, police after being signaled by police to stop. This clearly fits within the definition of a crime of violence, as it "involves conduct that presents a serious potential risk of physical injury to another." U.S.S.G. § 4B1.2(a)(2).

As *Sykes* explained, "[r]isk of violence is inherent to vehicle flight. Between the confrontations that initiate and terminate the incident, the intervening pursuit creates high risks of crashes. It presents more certain risk as a categorical matter than burglary." *Sykes*, 131 S. Ct. at 2274. "Unlike burglaries, vehicle flights from an officer by definitional necessity occur when police are present, are flights in defiance of their instructions, and are effected with a vehicle that can be used in a way to cause serious potential risk of physical injury to another." *Id.*; *see also Commonwealth v. Ruffin*, 16 A.3d 537 (Pa. Super. Ct. 2011) (describing a misdemeanor flight conviction under § 3733 involving a flight from police, where the defendant put his car into reverse and caused a collision with a police vehicle). Accordingly, when intentional vehicular flight from law enforcement does not "create[] an extraordinary danger," but nonetheless falls under Pennsylvania's misdemeanor flight provision, we hold that such flight still categorically "presents a serious potential risk of physical injury to another," constituting a crime of violence under the sentencing guidelines. *See In re R.C.Y.*, 27 A.3d at 230; U.S.S.G. § 4B1.2(a)(2).[3] We therefore conclude that the District

---

[3] Jones's argument pertaining to *United States v. Lewis*, 330 Fed. App'x 353 (3d Cir. 2009) does not alter our conclusion. "It is well established that we are not bound by our own non-

19

Court's error in applying the modified categorical approach was harmless and we will affirm the District Court's ruling that Jones's misdemeanor flight conviction qualified as a crime of violence.

### 2. Enhancement for Assault on Official Victim

Jones next argues that the District Court erred by applying a six-level enhancement pursuant to U.S.S.G. § 3A1.2(c)(1). That provision permits an increase in sentence where, "in a manner creating a substantial risk of serious bodily injury, the defendant . . . having reasonable cause to believe that a person was a law enforcement officer, assaulted such officer during the course of the offense or immediate flight therefrom." Application Note 4 to that Guideline states in relevant part: "Subsection (c) applies in circumstances tantamount to aggravated assault (i) against a law enforcement officer, committed in the course of, or in immediate flight following, another offense . . . ."

The parties do not dispute that Jones reasonably understood that Officer Onderko and Baney were law enforcement officers as required by the first clause of § 3A1.2(c)(1). Rather, the issue on appeal concerns whether Jones actually assaulted a law enforcement officer pursuant to the enhancement. Jones claims that "assault," under § 3A1.2(c)(1), requires assaultive conduct whereby he caused an official victim to actually experience apprehension of immediate bodily injury. Jones contends that the facts of this case fail to support any such finding. The Government

---

precedential opinions." *Castillo v. Attorney Gen. U.S.*, 729 F.3d 296, 310 n.4 (3d Cir. 2013).

responds that the act of producing a gun while running from law enforcement constitutes assault, because such an act could reasonably cause fear.

Section 3A1.2(c)(1) does not define assault, and its precise meaning is a matter of first impression in our Court. However, several of our sister circuit courts have attempted to parse the language of this enhancement. For instance, in *United States v. Lee*, 199 F.3d 16 (1st Cir. 1999), a defendant physically struggled with officers in attempting to escape from a traffic stop, while repeatedly reaching for a loaded gun in his waistband. *Id*. at 16-17. In determining whether such conduct amounted to assault, the court in *Lee* held, and the parties agree, that assault under § 3A1.2(c)(1) should generally "be read as a reference to common law criminal assault."[4] *Id*. at 17.

*Lee* has been cited approvingly by several other circuit courts for the proposition that the definition of common law assault applies to § 3A1.2(c)(1), and we are aware of no court of appeals that has held to the contrary. *See United States v. Olson*, 646 F.3d 569, 572 (8th Cir. 2011) ("We join those circuits that have concluded that the term 'assault' in the Official Victim enhancement is a reference to common-law criminal assault."); *United States v. Hampton*, 628 F.3d 654, 660 (4th Cir. 2010) (noting with approval that "application of the common law meaning of 'assault' provides us with the

---

[4] At that time, the assault enhancement was designated § 3A1.2(b). Any differences in the wording of the current enhancement are immaterial. For the sake of clarity, we refer to the enhancement under its current numbering, § 3A1.2(c)(1), regardless of its designation in any opinion.

same result we reach by considering its common meaning"); *United States v. Robinson*, 537 F.3d 798, 803 (7th Cir. 2008). In addition, we previously adopted the common-law definition of assault where that term was undefined in a federal statute. *See United States v. McCulligan*, 256 F.3d 97, 102 (3d Cir. 2001). Thus, in interpreting § 3A1.2(c)(1), we hold in accord with our sister circuits that assault is defined according to its common-law definition.

Thus, we adopt the concept of assault as generally outlined in *Lee*:

> Common law assault embraces two different crimes: one is attempted battery, that is, an intended effort to cause bodily harm to another which falls short of success . . . regardless of whether the intended victim knows of the attempt . . . The other branch of assault *is an act which is intended to, and reasonably does, cause the victim to fear immediate bodily harm;* such "menacing" constitutes assault even if no physical harm is attempted, achieved, or intended.

199 F.3d at 18 (emphasis added) (citations omitted). In rendering its decision, the *Lee* court first held that attempted battery was inapplicable, as there had been no finding of intent on the part of the defendant to shoot at the police officers, "and it is not clear that the evidence would readily

22

lend itself to such a finding unless the judge discredited Lee's own statement as to his intent." *Id.* However, the court determined that the second type of assault, an act which would reasonably cause fear, reflected the defendant's actions, as the defendant's "efforts to free his gun did cause [the officer] to fear – quite reasonably so, in our view – and the district judge so found." *Id.* at 20.[5]

Just as the court in *Lee*, we can readily dispose of the first prong of assault, attempted battery. The Government does not claim, and the District Court here made no finding, that Jones withdrew the gun with the intent to harm either Officer Onderko or Officer Baney. The most that can be said is that the District Court granted a separate enhancement, not appealed here, under § 2K2.1(b)(6), which involves the use of a firearm in connection with another felony offense. The Court granted the enhancement on the ground that the defendant "used or possessed the firearm at issue while resisting arrest." (App. 306.) In connection with that ruling the Court stated, "I find it reasonable to infer from the circumstances surrounding his flight and efforts to resist arrest that he drew the firearm at that precise moment in order to further his efforts to escape. At a minimum, drawing a firearm at that moment certainly had the potential to facilitate

---

[5] Significant for our analysis below, the facts of *Lee* indicate that the officers were aware of the threat that the defendant was reaching for a gun. *See*, 199 F.3d at 17 ("[T]he officers screamed to each other that Lee was reaching for his waist and they sought to grab his hands.")

23

his resisting arrest." [6] (App. 305.) Such statements do not constitute a finding that Jones withdrew the gun with the intent to harm Officer Onderko or Baney, and the evidence does not support such a finding. Accordingly, attempted battery, which requires a finding that the defendant intended to harm another, is inapplicable here.

The second type of assault, dubbed "menacing" in *Lee*, presents a closer question. Such assault requires that the defendant intends to and reasonably does cause fear. The "intends to" element, for purposes of this provision, should be satisfied if the defendant has "ample reason to know that fear will be caused," such that "the lack of purpose to cause fear should not matter." *Lee*, 199 F.3d at 19. We will not dwell on the intent requirement as it is clearly satisfied in this case. But, the "reasonably does cause fear" aspect is more troubling. Jones argues that he did not commit assault in part because he did not actually frighten Officer Onderko. By contrast, the Government notes that Officer Baney saw Jones withdraw the handgun and that the gun had a profound impact on Officer Baney.

However, the Government argued below only that Jones assaulted Officer Onderko, and never claimed that

---

[6] Similarly, the District Court also overruled Jones's objection which sought to modify the PSR to state that Jones intentionally threw the gun away when he was tackled by Officer Onderko. However, the District Court made no affirmative finding as to Jones's intent when he produced the gun.

24

Officer Baney was a victim of an assault.[7]  The Government has therefore waived any claim on appeal that Officer Baney was assaulted during the foot-chase.

Accordingly, the sole question is whether Jones assaulted Officer Onderko by "menacing." As noted above, Officer Onderko was pursuing Jones on foot from behind, and he could see that Jones was "digging, either in his pockets or in his waistband," but Officer Onderko could not tell what Jones was reaching for.  (App. 262.)  When asked whether he would have done anything differently if he had known Jones had a gun, Officer Onderko responded, "I would not have tackled him." (App. 264.)   That clearly indicates that Officer Onderko did not realize Jones had a gun and thus did not experience fear.

---

[7] *See* (Gov. Supp. Sentencing Mem., App. 104 ("Defendant resisted arrest and assaulted Officer Onderko."); *id.* at App. 105 (arguing that § 3A1.2(c)(1) "applies here, based on Defendant's resisting arrest and assaultive conduct against Officer Onderko . . . ."); Sentencing Transcript, November 28, 2012, App. 284 (Government attorney claiming, "his mens rea goes to his knowing or having reasonable cause to believe that Officer Onderko, whom he assaulted, was a law enforcement officer."); *id.* at App. 202 (Defense attorney noting "the only one he's alleged to have committed an aggravated assault on is Officer Onderko."); Gov. Post-Hearing Brief, App. 181 ("Thus, section 3A1.2 applies if the Defendant *either* assaulted Officer Onderko when Defendant drew his weapon, *or* if Defendant assaulted Officer Onderko thereafter, in his 'immediate flight' from the offense.")).

Officer Baney's testimony noted the simultaneous nature of the events at issue. As he stated at sentencing, "I saw the weapon being pulled, I yelled gun, and that is exactly when in a simultaneous action Officer Onderko tackled Mr. Jones." Officer Baney further agreed that at the "moment of impact" Jones's arm went up and "the gun [went] flying." (App. 219.)

Seeking to clarify the language of the criminal complaint drafted by Officer Baney, the Government further focused on the precise timing of the events at issue. Government counsel inquired, "[w]hat about the sense of timing that comes from that sentence, when you have the phrase throw a gun and was tackled. Did you intend, are you expressing that those happened at separate points in time?" Officer Baney replied, "[n]o, I'm just expressing that it happened at that time." Government counsel further asked, "[y]our understanding of the event, was that it was a simultaneous gun flying in the air at the moment of tackle?" Officer Baney responded unequivocally, "[y]es." (App. 227-28).

Taken together, Officer Baney's testimony establishes that he yelled "gun," "exactly when in a simultaneous action Officer Onderko tackled Mr. Jones," and that "it was a simultaneous gun flying in the air at the moment of tackle[.]" (App. 219, 227-28.) Therefore, according to his own testimony, Officer Baney shouted "gun" at the same moment that the firearm flew out of Jones's hand.

For his part, Officer Onderko never saw the gun in Jones's hand, in the air, or even on the ground until Jones was finally apprehended. As Officer Onderko testified at

sentencing: "I did not see the gun until it was recovered." (App. 269.)  Further, nothing in the record indicates that Officer Onderko suspected that Jones had a gun during the pursuit.[8]  Finally, because Officer Baney yelled "gun" at the same moment that the gun flew out of Jones's hand, Officer Onderko was not aware of the presence of a firearm until it was no longer in Jones's possession.  The facts thus present a relatively unusual scenario, an alleged "menacing" assault where the victim was unaware of any menace until it had ceased.

A helpful framework for analyzing such an assault is found in one of the few cases presenting roughly similar facts, *United States v. Acosta-Sierra*, 690 F.3d 1111 (9th Cir. 2012). In that case, the defendant threw a rock at federal Customs and Border Protection Officer.  As the Ninth Circuit recounted, "[t]he rock did not strike Officer Lopez, though it came within two feet of hitting his head.  Officer Lopez did not see [the defendant] throw the rock or observe it travel through the air.  In fact, Officer Lopez only became aware of the rock when he heard it hit the metal gate behind him . . . ."

---

[8] The following exchange took place at sentencing:

Counsel for Government: And as you see him then reaching for something at his waistband, you don't know what he's grabbing for?

Officer Onderko: No, I do not.

Counsel for Government: Just digging around for something.

Officer Onderko: That's correct.  (App. 263.)

*Id*. at 1115. The defendant was charged with assault on a federal officer, in violation of 18 U.S.C. § 111(a)(1) and (b). *Id.*

Because "assault" was not defined in the federal statute, the Ninth Circuit adopted a common law definition similar to that utilized above for § 3A1.2(c)(1). *Id.* at 1117. The *Acosta-Sierra* court further held that "a victim's apprehension of immediate bodily injury must be determined by an objective standard of reasonableness . . . the evidence must permit an inference that a reasonable person 'standing in the official's shoes,' that is, observing what the official observed, would have apprehended imminent bodily injury." *Id.* at 1119-20. This objective standard also aligns with the common-law test adopted for § 3A1.2(c)(1) in *Lee*: "an act which is intended to, and reasonably does, cause the victim to *fear* immediate bodily harm . . . ." 199 F.3d at 18.

Applying this standard, the court noted that "Officer Lopez did not see [the defendant] before he threw the rock and did not realize what had happened until after the threat of imminent bodily harm had passed. A reasonable person observing what Officer Lopez observed, therefore, would not have been aware of any threat." *Acosta-Sierra*, 690 F.3d at 1121. Thus, the court held, "[b]ecause Officer Lopez did not become aware of the threat until after it had dissipated, a reasonable person in his position would not have apprehended immediate bodily injury." *Id*. at 1123. The Ninth Circuit concluded that assault, founded on reasonable apprehension of harm, did not apply to the defendant's actions.

We similarly conclude that, given the consistent reporting of the events in the record, whereby Officer

28

Onderko did not see the gun, no assault occurred.[9]  We need not decide whether, as Jones contends, an official must subjectively experience apprehension for § 3A1.2(c)(1) to apply.   This is because, at minimum, such fear must be objectively reasonable.   *See Lee*, 199 F.3d at 18; *United States v. Olson*, 646 F.3d 569, 574 (8th Cir. 2011) (finding that fear of officers "was reasonable," in applying assault enhancement); *United States v. Ford*, 613 F.3d 1263, 1269 (10th Cir. 2010) ("The evidence easily supports the district court's finding that the gunshots placed the officers in reasonable apprehension of being shot.")   That is, a court must find that a defendant's actions would cause fear in a reasonable person standing in the shoes of the official victim. This reasonableness evaluation incorporates the observations actually made by the official, and does not permit a court to presume additional knowledge or sight.   The record established that as Officer Onderko was unaware and did not suspect that Jones possessed a gun, a reasonable person in his position would not have experienced fear, and thus Jones did not commit an assault.   We therefore conclude that the Government failed to carry its burden to show by a preponderance of the evidence that this enhancement should apply.  *See United States v. Diallo*, 710 F.3d 147, 151 (3d Cir. 2013) ("[T]he government always bears the burden of proving by a preponderance of the evidence that the facts support a sentencing enhancement . . . .")

Adopting the Government's position would elevate any conduct that might cause fear to the level of assault,

---

[9] We also find that the issue of timing was exhaustively addressed at sentencing, and further evidentiary development on this point upon remand is not warranted.

29

regardless of whether any official victim felt, or would reasonably have felt, apprehension. This standard would read the element of "assault" out of the guideline, instead enhancing sentences for any conduct that creates a risk of bodily harm, even though such acts are already addressed by other enhancements. *See e.g.,* U.S.S.G. § 3C1.2 ("Reckless Endangerment During Flight"). We decline to render the critical requirement of assault a nullity.

The reasoning of the District Court in granting the enhancement does not alter our conclusion. The District Court found that "[c]ourts have repeatedly held that section 3A1.2 official victim enhancement is properly applied in situations where a defendant who is fleeing or scuffling with police officers attempts to produce or utilize a firearm because 'simply reaching for a loaded gun is enough to create a substantial risk of serious bodily injury to another person.'" (App. 17) (quoting *United States v. Easter*, 553 F.3d 519, 524 (7th Cir. 2009)). However, *Easter* concerned a different guideline enhancement, "Reckless Endangerment During Flight," which applies, "[i]f the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer . . . ." U.S.S.G. § 3C1.2. Section 3A1.2(c)(1), the enhancement at issue here, requires not simply the creation of a risk of bodily harm, but that the defendant actually assaults a law enforcement officer. Reckless endangerment is far different from assault, yet the District Court did not address the elements of an assault. Under any of the potentially applicable standards of review, this constitutes reversible error.

We also note that this case is factually distinguishable from most of the existing case law. The Government and District Court both cited cases applying the assault enhancement where a defendant reached for a gun near a law enforcement official, but critically, the facts in such cases supported a finding of reasonable fear on the part of the official victim. For instance, the District Court cited at length an unpublished Tenth Circuit opinion, *United States v. Boysel*, 208 F.3d 227 (10th Cir. 2000), which concerned a traffic stop wherein the defendant attempted to draw his gun near a police officer. There, the Tenth Circuit noted that the defendant exited his vehicle in an aggressive manner, and the officer saw the defendant "'very quickly reach[] behind the small of his back, with his palm facing out, not to pull up a T-shirt, but as to go for a weapon.'" *Id*. at *1. The Tenth Circuit concluded that under such circumstances "a similarly situated reasonable person would have experienced apprehension," and upheld the enhancement for assault. *Id.* at *2. Unlike the official in *Boysel*, Officer Onderko was unaware of any threat until it had passed.

Other cases cited by the District Court and Government are even further afield. In *United States v. Hill*, 583 F.3d 1075, 1079-80 (8th Cir. 2009), an assault enhancement was upheld where the district court found that, "[t]he defendant was attempting to draw a weapon in order to discharge that weapon at the officer . . . The defendant stopping, turning towards the officer as he attempted to draw the weapon creates a clear inference that the defendant was attempting to use that weapon against the officer . . . ." Such findings readily support an assault via attempted battery, where, unlike assault by menacing, the defendant intends to

physically harm another but fails in the effort.[10] Here, the District Court made no finding that Jones intended to harm the officers, and attempted battery therefore cannot apply.

The final case cited by the District Court, *United States v. Powell*, 6 F.3d 611 (9th Cir. 1993), also dealt with a traffic stop where the defendant exited the car holding a gun. While that case did not focus on the assaultive conduct at issue, the Ninth Circuit did recount that the officer saw the firearm, "screamed, 'Gun!' and attacked [the defendant] in an effort to separate [the defendant] from the weapon." *Id.* at 612. Such facts indicate that the officer was aware of the threat and would reasonably have feared for his safety in such a situation. Again, none of the cases cited above presents an analogous situation to this case, where the alleged assault victim was wholly unaware of the assaultive threat. Under these rather unique circumstances, we hold that Officer Onderko was not assaulted, under § 3A1.2(c)(1), by Jones's production of the gun.[11]

---

[10] It is immaterial whether the intended victim is aware of an attempted battery, all that is required is an intent on the part of the perpetrator to cause bodily harm. *See Lee*, 199 F.3d at 18.

[11] The Government does not contend on appeal that Jones's struggle with and flight from Officer Onderko constituted assault, nor that Officer Onderko's leg injury was the result of assault. *Cf. United States v. Hampton*, 628 F.3d 654, 660-62 (4th Cir. 2010) (finding completed battery in defendant's struggle with police, constituting assault under § 3A1.2(c)(1)). Accordingly, we do not address such arguments.

32

We stress that our holding today is narrow and highly fact-specific, as indeed are many of the cases concerning an enhancement pursuant to § 3A1.2(c)(1). We do not diminish the risks faced and fear experienced by law enforcement when confronted with a suspect attempting to withdraw a firearm. Rather, our holding in this case simply reflects the common-sense conclusion that if an officer is unaware that a defendant is attempting to withdraw a gun, that officer has not been assaulted by this conduct under § 3A1.2(c)(1).[12] The District Court therefore erred in applying the enhancement and we will vacate the judgment of sentence and remand for re-sentencing.

3. Reasonableness of Guidelines and Defense Counsel's Argument

Jones makes two final, somewhat related, arguments. His first contention is that the District Court improperly presumed that the guideline sentence range should apply. That is, a district court judge "may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 50 (2007) (citation omitted).

Jones's argument is premised on a few statements made by the District Court at sentencing, which asked

---

[12] Again, as noted above, an attempted battery-type assault may be found if, unlike here, the record reflects that the defendant intended to cause bodily harm, regardless of whether the victim was aware of the attempt.

defense counsel to list "factors . . . that in your view support variance below the 120-month guideline range." (App. at 322.) Further, the District Court stated, "[i]n fashioning a sentence, I'm required to consider, in addition to the advisory guidelines range, the various factors set forth under 3553(a), and I've attempted to do that here." (App. 21-22.) Jones argues that such statements demonstrate that the Court presumed the guidelines to be reasonable, absent some affirmative reason to vary from them.

We have repeatedly acknowledged that a district court, "may vary upward or downward from the range suggested by the Guidelines." *United States v. Wright*, 642 F.3d 148, 152 (3d Cir. 2011). Thus, we cannot conclude that in simply asking defense counsel to support his argument for a variance, a court is improperly presuming the guidelines to be reasonable. *Cf. Nelson v. United States*, 555 U.S. 350, 350-51 (2009) (finding reversible error where district judge stated that "the Guidelines are considered presumptively reasonable . . . ."). Further, we find that the District Court thoughtfully performed the individualized analysis and consideration of § 3553(a) factors required at sentencing. (App. 325-30.) The record thus confirms that the District Court at no point presumed the guidelines range to be reasonable, and we accordingly reject Jones's argument on this ground.

Lastly, Jones contends that the District Court failed to address his argument that it did not promote respect for the law or provide just punishment to increase his sentence due to enhancements based on uncharged conduct. He made a related argument that a high sentence sends the wrong message to the community because it signals to offenders that entering a plea (or cooperating with authorities generally)

34

does not lead to leniency. A sentencing "court must acknowledge and respond to any properly presented sentencing argument which has colorable legal merit and a factual basis." *United States v. Begin*, 696 F.3d 405, 411 (3d Cir. 2012) (quoting *United States v. Ausburn,* 502 F.3d 313, 329 (3d Cir.2007)).

It is well established that "conduct not formally charged or not an element of the offense can be considered at sentencing . . . ." *United States v. Baird*, 109 F.3d 856, 863 (3d Cir. 1997). The Supreme Court has further held that "a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence." *United States v. Watts*, 519 U.S. 148, 157 (1997). After reviewing the District Court's reasons for its sentence, we conclude that it sufficiently considered and addressed Jones's arguments.

Defense counsel initially stated that it was "wrong" to increase Jones's sentence because of a finding, under the guidelines, that he had assaulted a police officer. The Court responded, "You have a fundamental disagreement with the enhancements . . . under the guidelines, correct?" (App. 315.) To this defense counsel responded in part, "[o]ne of the biggest problems I have with the guidelines, is the government uses it to get around the Constitution. The idea that if you think he committed an aggravated assault, charge him with that . . . ." (App. 315.)

Later, when defense counsel again reiterated his argument concerning the finding of uncharged offenses, the Court again stated, "[b]ut your point is, so I can make sure I

35

digest it and think about it appropriately. Your point is, not only in this case, but in every case where an enhancement applies, isn't that really your point?" (App. 323.) Defense counsel then argued in part, "I would say anybody who pleads guilty should not get the statutory maximum. That's just fundamentally wrong." (App. 323.)

In outlining its sentence, the District Court again addressed defense counsel's argument about promoting respect for the law and providing just punishment. The Court first recounted in detail Jones's lengthy and violent criminal history before stating:

> I've also considered the sentencing goal of promoting respect for the law and the related goal of imposing a sentence that is sufficient, but not greater than necessary, to effectuate the sentencing goals.
>
> I do not dispute that the guideline range here, driven by the enhancements, is significant. And clearly much more significant than it otherwise would have been without them. But the defendant finds himself in that range because of his conduct and no other reason.

(App. 329.) We conclude that the District Court's thorough questioning and thoughtful discussion at sentencing refutes

any contention that it somehow ignored defense counsel's argument. *cf. Begin*, 696 F.3d at 411 (finding that the district court "asked no questions" concerning an argument of defense counsel, in holding that the court failed to address it). We, thus, reject Jones's argument to the contrary.

## III.

For the reasons stated above, we affirm in part and reverse in part the District Court's judgment of sentence. The sentence is vacated and the case is remanded for resentencing.