**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-2562
_____

JACKSON NJAI NDUNGU,
Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA
_____

On Petition for Review of a
Decision of the Board of Immigration Appeals
(A059-942-954)
Immigration Judge:  Kuyomars Q. Golparvar
_____

Argued Before a Merits Panel on January 10, 2023
Reargued En Banc on October 9, 2024[1]
_____

Before:  JORDAN, PHIPPS, and ROTH, *Circuit Judges*

(Filed: January 13, 2025)
_____

---

[1] After voting *sua sponte* for en banc rehearing and oral argument, a majority of active judges voted to remand this case to the panel for disposition.

Andrew J. Mahon          **[ARGUED MERITS]**
BARLEY SNYDER
100 E Market Street
York, PA 17401

Christopher R. Healy     **[ARGUED EN BANC]**
Kaitlin L. O'Donnell
Sierra Stockley
TROUTMAN PEPPER LOCKE
3000 Two Logan Square
18th and Arch Streets
Philadelphia, PA 19103

> *Counsel for Petitioner Jackson Njai Ndungu*

Ryan M. Chabot
Olivia Greene
Cassandra Mitchell
Alan E. Schoenfeld
WILMERHALE
7 World Trade Center
250 Greenwich Street
New York, NY 10007

> *Counsel for Amicus American Immigration
> Lawyers Association in Support of Petitioner*

Michael B. Kimberly      **[ARGUED EN BANC]**
Charles H. Seidell
MCDERMOTT WILL & EMERY
500 N Capitol Street NW
Washington, DC 20001

> *Counsel for Amicus National Association of
> Criminal Defense Lawyers in Support of
> Petitioner*

2

Andrew B. Wachtenheim
IMMIGRANT DEFENSE PROJECT
P.O. Box 1765
New York, NY 10027

> *Counsel for Amicus Heartland Alliance's National Immigrant Justice Center, Immigrant Defense Project, and National Immigration Project of the National Lawyers Guild in Support of Petitioner*

Margaret A. Kopel
NATIONALITIES SERVICE CENTER
1216 Arch Street
4th Floor
Philadelphia, PA 19107

> *Counsel for Amicus Nationalities Service Center in Support of Petitioner*

James P. Davy
ALL RISE TRIAL & APPELLATE
P.O. Box 15216
Philadelphia, PA 19125

> *Counsel for Amicus Former Executive Office of Immigration Review Judges in Support of Petitioner*

Jonathan A. Robbins          **[ARGUED MERITS]**
Erik R. Quick
UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF IMMIGRATION LITIGATION
P.O. Box 878
Ben Franklin Station
Washington, DC 20044

*Counsel for Respondent Attorney General
United States of America*

_____

OPINION OF THE COURT
_____

PHIPPS, *Circuit Judge*.

By statute, lawfully admitted noncitizens are subject to deportation for committing two or more crimes involving moral turpitude on separate occasions. *See* 8 U.S.C. § 1227(a)(2)(A)(ii). A lawfully admitted Kenyan national residing in Lancaster, Pennsylvania, was convicted in 2014 and again in 2019 of felony vehicular fleeing or attempting to elude a pursuing police officer in violation of § 3733(a.2) of Title 75 of the Pennsylvania Consolidated Statutes. On the premise that the offense constituted a crime involving moral turpitude, the Department of Homeland Security charged the Kenyan national with removability based on those two convictions and secured orders of removal from the Immigration Court and from the Board of Immigration Appeals. The Kenyan national petitioned this Court for relief, and on *de novo* review of the BIA's final order, we hold that under the categorical approach, one of the felony subsections of the Pennsylvania fleeing-or-eluding statute does not necessarily involve moral turpitude, and therefore, we will grant the petition.

## I. BACKGROUND

### A. Jackson Ndungu Lawfully Enters the United States in 2009

Because Kenya does not participate in the Visa Waiver Program[2] and is ineligible for another form of country-specific visa waiver, citizens of Kenya must obtain a visa to lawfully enter the United States. Based on Kenya's historically low rates of immigration to the United States, however, persons chargeable to Kenya by birth or otherwise may qualify for the Diversity Immigrant Visa Program.[3] That Program, which is also referred to as the 'Diversity Program' or the 'Green Card Lottery,' randomly selects among the applicants in a region those who may apply for a fixed number of immigrant visas,[4] which allow noncitizens to stay in the United States indefinitely.[5]

---

[2] *See* 8 U.S.C. § 1187(a) (authorizing the Visa Waiver Program); 8 C.F.R. § 217.2(a) (designating countries eligible for the Visa Waiver Program).

[3] *See* Immigration Act of 1990, Pub. L. No. 101-649, § 131, 104 Stat. 4978, 4997–99 (1990) (codified at 8 U.S.C. § 1153(c) (amended 2002)) (authorizing the Diversity Program); 22 C.F.R. § 42.33(a) (setting eligibility criteria for the Diversity Program); *see also id.* § 42.12(a) (providing the rules of chargeability).

[4] *See* 8 U.S.C. § 1153(e)(2). *See generally Coraggioso v. Ashcroft*, 355 F.3d 730, 732 (3d Cir. 2004) (explaining the Diversity Program's administration).

[5] *See Almaqrami v. Pompeo*, 933 F.3d 774, 776 (D.C. Cir. 2019) (explaining that diversity immigrant visas "allow recipients who are granted admission to enter the country as lawful permanent residents who may live and work here indefinitely").

Jackson Ndungu, a native and citizen of Kenya, submitted a petition under the Diversity Program and was selected to apply for one of the 55,000 immigrant visas authorized for the 2008 fiscal year. *See* Immigration Act of 1990, Pub. L. No. 101-649, § 131, 104 Stat. 4978, 4997–99 (1990) (codified at 8 U.S.C. § 1153(e)(2)); *see also* 8 U.S.C. § 1151(e) (2006) (setting the worldwide diversity level at 55,000 per fiscal year). He received an immigrant visa, and on July 9, 2008, at age 21, he was admitted to the United States in Philadelphia, Pennsylvania. Ndungu settled in Lancaster County, Pennsylvania.

While in the United States, Ndungu was convicted of several crimes under Pennsylvania law. He pleaded *nolo contendere* in 2014 and 2019 to separate charges of felony fleeing or attempting to elude law enforcement, and those each resulted in convictions under 75 Pa. Cons. Stat. § 3733(a.2)(2). Also, in between those two convictions, in December 2016, Ndungu was convicted of two related counts of simple assault in violation of 18 Pa. Cons. Stat. § 2701(a)(1).[6]

## B. The Deportation Consequences for Convictions for Multiple Crimes Involving Moral Turpitude

Convictions for certain classes of crimes subject lawful permanent residents to deportation. *See* 8 U.S.C. § 1227(a)(2). Beginning with the Immigration Act of 1891, Congress excluded from admission to the United States "persons who have been convicted of a felony or other infamous crime or misdemeanor involving moral turpitude."[7] The Immigration

---

[6] Ndungu's criminal history also includes convictions on separate occasions for criminal mischief (damage to property), disorderly conduct, and resisting arrest.

[7] Immigration Act of 1891, ch. 551, § 1, 26 Stat. 1084, 1084 (1891); *Jordan v. De George*, 341 U.S. 223, 229 n.14 (1951)

Act of 1917 supplemented that exclusion provision with deportation consequences for noncitizens who, while in the United States, were convicted of a crime involving moral turpitude – commonly abbreviated as a 'CIMT.' One of those grounds for deportation added by that legislation was the commission of multiple CIMTs that each resulted in the noncitizen's imprisonment for over a year.[8] The Immigration and Nationality Act of 1952 amended that provision by adding as a ground for deportation the commission of "two crimes involving moral turpitude, not arising out of a single scheme" regardless of the length of the term of imprisonment associated with those crimes. Immigration and Nationality Act of 1952, Pub. L. No. 82-414, § 241(a)(4), 66 Stat. 163, 204 (1952). Since 1996, the multiple-CIMT removal provision has had the following text:

> Any alien who at any time after admission is convicted of two or more crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct, regardless of whether confined therefor and regardless of whether the convictions were in a single trial, is deportable.

8 U.S.C. § 1227(a)(2)(A)(ii); *see also* Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, §§ 305(a)(2), 308(f)(1)(N), 110 Stat. 3009–546, 3009–598, 3009–621 (1996) (redesignating the code section for the provision and striking the prior term 'entry' and replacing it with 'admission').

---

("The term 'moral turpitude' first appeared in the Act of March 3, 1891, 26 Stat. 1084 . . . .").

[8] Immigration Act of 1917, Pub. L. No. 64-301, ch. 29, § 19, 39 Stat. 874, 889 (1917).

## 1. Definitional Ambiguity and Resolution

Although Congress has long used 'moral turpitude' in the immigration statutes, it has never defined that term. *See Larios v. Att'y Gen.*, 978 F.3d 62, 69 (3d Cir. 2020) ("There is no statutory definition of a crime involving moral turpitude . . . ."); *Silva-Trevino*, 24 I. & N. Dec. 687, 689 n.1 (A.G. 2008) ("The absence of a statutory definition dates back to 1891, when the term first appeared in the immigration context . . . ."), *vacated on other grounds*, 26 I. & N. Dec. 550 (A.G. 2015). Without a statutory definition, the Supreme Court, in *Jordan v. De George*, 341 U.S. 223 (1951), after surveying federal and state caselaw, including one of its own decisions, gave the term some meaning by ruling that the term CIMT is broad enough to encompass "crimes in which fraud was an ingredient." *Id.* at 232; *see also United States ex rel. Volpe v. Smith*, 289 U.S. 422, 423–24 (1933) (concluding the possession and passing of counterfeit war saving stamps was "plainly a crime involving moral turpitude").[9]

Over time, this Court has resolved much of that ambiguity. It has done so not by looking to the common-law meaning of CIMT, and for good reason: it is not clear that the term had an established meaning prior to its inclusion in the immigration statute. *See* Note, *Crimes Involving Moral Turpitude*, 43 Harv. L. Rev. 117, 118 n.7 (1929) (reporting that no case in English

---

[9] *Cf. Jordan*, 341 U.S. at 232, 235 (Jackson, J., dissenting) (arguing that "the phrase 'crime involving moral turpitude[]' . . . has no sufficiently definite meaning to be a constitutional standard for deportation" and that it is an "undefined and undefinable standard"); *De Leon-Reynoso v. Ashcroft*, 293 F.3d 633, 635 (3d Cir. 2002) ("The term 'moral turpitude' defies a precise definition."); Julia Ann Simon-Kerr, *Moral Turpitude*, 2012 Utah L. Rev. 1001, 1039 (opining that the moral-turpitude standard "was part of a character metric used to gauge the fitness of individuals to enter or remain in the country").

law used that term); *cf. Taylor v. United States*, 495 U.S. 575, 598–99 (1990) (rejecting a common-law meaning of burglary in the context of a federal statute's use of that term for purposes of a sentencing enhancement). Nor has this Court surveyed the law from every state that uses the term 'moral turpitude' in its laws to find a consensus generic meaning of the term CIMT at the time of the statute's enactment. *Cf. Taylor*, 495 U.S. at 598–99 (relying on the consensus generic meaning of 'burglary'); *cf. also Mathis v. United States*, 579 U.S. 500, 503 (2016) (describing the "generic" version of the crime as the elements of "the offense as commonly understood"); *Esquivel-Quintana v. Sessions*, 581 U.S. 385, 394 (2017) (explaining that the relevant date for the commonly understood meaning is the date of the statute's enactment). So while reliance on such a federal generic standard is common in other contexts, *see, e.g.*, *Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 190 (2007); *Mathis*, 579 U.S. at 503–04; *Esquivel-Quintana*, 581 U.S. at 394, it does not appear that there is any binding precedent attempting such a consensus-of-meaning approach for understanding CIMTs. Instead, through a series of decisions, this Court has considered various interpretations of 'moral turpitude' offered by federal agencies for the past 80 years.[10] Those decisions initially relied on *Chevron* deference,[11] but

---

[10] *See, e.g.*, *Javier v. Att'y Gen.*, 826 F.3d 127, 131, 132 n.6 (3d Cir. 2016) (referencing agency decisions discussing the CIMT standard from 1968 to 1994); *Jean-Louis v. Att'y Gen.*, 582 F.3d 462, 468–70, 473 n.14 (3d Cir. 2009) (referencing agency decisions discussing the CIMT standard from 1941 to 2007); *Partyka v. Att'y Gen.*, 417 F.3d 408, 411–15 (3d Cir. 2005) (referencing agency decisions discussing the CIMT standard from 1944 to 2001); *Knapik v. Ashcroft*, 384 F.3d 84, 89–90 (3d Cir. 2004) (referencing agency decisions discussing the CIMT standard from 1968 to 1997).

[11] *See Knapik*, 384 F.3d at 87–88; *see also Mehboob v. Att'y Gen.*, 549 F.3d 272, 275–76 (3d Cir. 2008). *But compare Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984), *with Loper Bright Enters. v. Raimondo*,

over time they relied instead on the persuasive power of the agency's definitions,[12] and they have resulted in a two-element standard for a CIMT consisting of an *actus reus* and a *mens rea*.[13] For the *actus reus*, the crime must involve reprehensible conduct, meaning an act that is "inherently base, vile, or depraved contrary to the accepted rules of morality and the duties owed to other persons, either individually or to society in general." *Larios*, 978 F.3d at 69 (quoting *Javier v. Att'y Gen.*, 826 F.3d 127, 130–31 (3d Cir. 2016)); *Ortega-Lopez*, 27 I. & N. Dec. 382, 385 (B.I.A. 2018). And for the *mens rea*, the crime must be committed with a culpable mental state. Specific intent, deliberateness, or willfulness satisfies that requirement – as does recklessness, defined as "a conscious disregard of a substantial and unjustifiable risk that serious

603 U.S. 369, 402–03 (2024) ("For those reasons, delegating ultimate interpretive authority to agencies is simply not necessary to ensure that the resolution of statutory ambiguities is well informed by subject matter expertise. The better presumption is therefore that Congress expects courts to do their ordinary job of interpreting statutes, with due respect for the views of the Executive Branch.").

[12] *See Partyka*, 417 F.3d at 413 (finding the BIA's test "persuasive"); *see also Javier*, 826 F.3d at 131 (recognizing that the BIA and this Court use the same definitions to define "morally turpitudinous conduct" (quoting *Mahn v. Att'y Gen.*, 767 F.3d 170, 174 (3d Cir. 2014))). *See generally Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (recognizing that an agency's interpretation of a statute may be given weight by a court to the extent that the interpretation has the "power to persuade").

[13] *See Ortega-Lopez*, 27 I. & N. Dec. 382, 385 (B.I.A. 2018) ("To constitute a crime involving moral turpitude, an offense must have two essential elements: a culpable mental state and reprehensible conduct."); *Acosta*, 27 I. & N. Dec. 420, 422 (B.I.A. 2018) (setting forth the two elements of moral turpitude and their definitions).

injury or death would follow." *Partyka v. Att'y Gen.*, 417 F.3d 408, 414 (3d Cir. 2005); *id.* at 414–16 (explaining that recklessness in the presence of aggravating factors qualifies as a culpable mental state); *cf. Mehboob v. Att'y Gen.*, 549 F.3d 272, 276 (3d Cir. 2008) ("This Court, however, has drawn a line at recklessness, and has held that moral turpitude does not inhere in a crime merely requiring a mental state of negligence.").

## 2. *Methodological Direction*[14]

The Supreme Court has provided methodological guidance for determining whether a predicate offense constitutes a CIMT under the immigration statute. In *Jordan v. De George*, 341 U.S. 223 (1951), the Supreme Court concluded that the offense of conspiracy to defraud the United States of taxes on distilled spirits had an element of fraud and was therefore a CIMT for purposes of the immigration statute. *Id.* at 223–24, 232. Thus, as inferior courts had previously done, the Supreme Court opted for an elemental analysis rather than looking to the facts underlying the conviction to determine whether they were morally turpitudinous. *Id.* at 226–29. *See generally* Simon-Kerr, *Moral Turpitude*, 2012 Utah L. Rev. at 1007 ("Beginning in the 1920s, the federal courts developed what is now called the categorical approach, a formalistic approach that prevents them from probing below the surface of a conviction to any of the facts that might inform a moral judgment about the act.").

Starting with its decision in *Taylor v. United States*, 495 U.S. 575 (1990), the Supreme Court gave greater dimension to that elemental matching method, referred to as the 'categorical approach.' *See id.* at 588–602; *see also*

---

[14] While Judge Jordan joins this opinion, he notes again that the categorical approach applied here is deeply problematic, as described elsewhere, *see United States v. Harris*, 88 F.4th 458, 459 (3d Cir. 2023) (Jordan, J., concurring in denial of rehearing en banc).

11

*Moncrieffe v. Holder*, 569 U.S. 184, 190–95 (2013); *Nijhawan v. Holder*, 557 U.S. 29, 34–39 (2009); *Duenas-Alvarez*, 549 U.S. at 190–94. In the immigration context, that approach is tethered to one term in the Immigration and Nationality Act as amended – the word 'convicted,' *see* 8 U.S.C. § 1227(a)(2)(A); *Pereida v. Wilkinson*, 592 U.S. 224, 233 (2021) – and it examines whether all possible convictions for an identified offense, even those under the least culpable circumstances, would satisfy the relevant federal standard, which, here, is status as a CIMT. *See Borden v. United States*, 593 U.S. 420, 424 (2021) (explaining that the categorical approach asks whether of the acts criminalized, "even the least culpable" satisfies the federal standard); *Partyka*, 417 F.3d at 411 ("[W]e read the applicable statute to ascertain the least culpable conduct necessary to sustain a conviction under the statute."); *Esquivel-Quintana*, 581 U.S. at 390 (explaining that "[r]egardless of the actual facts of petitioner's crime" if the least culpable acts to sustain a statutory conviction do not constitute a removable offense under the INA, the petitioner is not removable); *see also Pereida*, 592 U.S. at 233 (applying the categorical approach to determine whether an offense was a CIMT); *Sasay v. Att'y Gen.*, 13 F.4th 291, 296 (3d Cir. 2021) (same); *Larios*, 978 F.3d at 69 (same); *Francisco-Lopez v. Att'y Gen.*, 970 F.3d 431, 435 (3d Cir. 2020) (same); *Jean-Louis v. Att'y Gen.*, 582 F.3d 462, 470 (3d Cir. 2009) (same); *Knapik v. Ashcroft*, 384 F.3d 84, 88 (3d Cir. 2004) (same).[15] Thus, while means and elements are distinct legal concepts,[16]

---

[15] In other contexts, the textual basis for the categorical approach depends on the cognate term 'conviction.' *See, e.g.*, 18 U.S.C. § 924(e)(1); U.S.S.G. § 4B1.1. *See generally Mathis*, 579 U.S. at 512 ("ACCA's use of the term 'convictions' still supports an elements-based inquiry; indeed, that language directly refutes an approach that would treat as consequential a statute's reference to factual circumstances *not* essential to any conviction.").

[16] *See Mathis*, 579 U.S. at 504 ("'Elements' are the 'constituent parts' of a crime's legal definition – the things the 'prosecution

12

for a prior conviction to qualify as a CIMT under the categorical approach, every means of committing that offense must satisfy the two CIMT elements – reprehensible conduct and a culpable mental state. *See Jean-Louis*, 582 F.3d at 471 ("As a general rule, a criminal statute defines a crime involving 'moral turpitude only if *all* of the conduct it prohibits is turpitudinous.'" (quoting *Partyka*, 417 F.3d at 411)); *see also Larios*, 978 F.3d at 67. So, rather than using a "circumstance-specific thrust,"[17] the categorical approach does not depend on the actual factual basis for the predicate convictions. *See United States v. Taylor*, 596 U.S. 845, 850 (2022) (emphasizing that courts, when applying the categorical approach, are precluded from inquiring "how any particular defendant may commit the crime"); *see also Pugin v. Garland*, 599 U.S. 600, 603–04 (2023); *Rosa v. Att'y Gen.*, 950 F.3d 67, 73 (3d Cir. 2020).

### C. The Removal Proceedings Against Ndungu Premised on 8 U.S.C. § 1227(a)(2)(A)(ii)

Based on his criminal history, DHS charged Ndungu with removability under 8 U.S.C. § 1227(a)(2)(A)(ii) on multiple occasions. Relevant here are the charges of removability brought in 2017 and 2019.[18]

---

must prove to sustain a conviction.'" (quoting *Elements of Crime*, *Black's Law Dictionary* (10th ed. 2014))); *see also Descamps v. United States*, 570 U.S. 254, 257 (2013); *Moncrieffe*, 569 U.S. at 198.

[17] *Mellouli v. Lynch*, 575 U.S. 798, 804 n.3 (2015); *see, e.g.*, *Nijhawan*, 557 U.S. at 36 (holding that the fraud-and-deceit provision in 8 U.S.C. § 1101(a)(43)(M)(i) calls for a "circumstance-specific" approach, *not* a categorical approach).

[18] Before initiating those proceedings, DHS, in May 2015, charged Ndungu with removability based on the combination of his 2014 conviction for fleeing or eluding law enforcement and his prior conviction in 2010 for criminal mischief (damage

In 2017, DHS identified two putative CIMTs that Ndungu had committed – his 2016 simple assault convictions and his 2014 conviction for fleeing-or-eluding – as bases for removal under § 1227(a)(2)(A)(ii).[19] But the Immigration Judge determined that simple assault under Pennsylvania law did not constitute a CIMT. And after concluding that those convictions were not CIMTs, the Immigration Judge recognized that by charging Ndungu with only one other potential CIMT (the 2014 felony fleeing-or-eluding conviction), DHS could not show that Ndungu committed two or more CIMTs – as required for removal under § 1227(a)(2)(A)(ii). Before terminating those proceedings, however, the Immigration Judge articulated his understanding that the Pennsylvania felony of fleeing or attempting to elude law enforcement was a CIMT and cautioned that "if [Ndungu] has another CIMT, obviously, he'll be back" because the fleeing-or-eluding conviction is "not forgiven[;] [i]t just isn't enough yet." Tr. 7:4–5, 9 (Mar. 22, 2017) (Supp. AR at 8).

After Ndungu's April 2019 conviction for felony fleeing-or-eluding-law-enforcement, DHS again charged Ndungu with removability under 8 U.S.C. § 1227(a)(2)(A)(ii). That charge was based on his felony fleeing-or-eluding convictions from

_____

to property). In response, Ndungu moved to terminate the removal proceedings, arguing that neither crime constituted a CIMT. DHS did not oppose that motion, and the Immigration Judge terminated the proceedings without prejudice. Ndungu does not now argue that those 2015 proceedings have *res judicata* effect (although he did before the Immigration Court, which rejected the contention).

[19] DHS also argued that Ndungu's simple assault convictions – because they involved his then-girlfriend – provided an independent basis for removability as convictions for domestic abuse are removable offenses. *See* 8 U.S.C. § 1227(a)(2)(E)(i). The Immigration Court rejected that argument.

2014 and 2019.  In response, Ndungu argued that *res judicata* principles precluded DHS from relying on his 2014 fleeing-or-eluding conviction as a predicate CIMT because DHS had previously tried to remove him based on that conviction. Ndungu also contended that the felony fleeing-or-eluding offense under Pennsylvania law did not constitute a CIMT.[20]

After a multi-day hearing, the Immigration Judge issued an interlocutory order that rejected both of those defenses.  With respect to *res judicata*, the Immigration Judge determined that although final orders of removal may preclude later claims, the order in the 2017 removal proceedings did not satisfy the elements of that defense.  And, in reviewing Ndungu's felony fleeing-or-eluding convictions from 2014 and 2019, the Immigration Judge concluded that they both qualified as CIMTs under the categorical approach.  Accordingly, the Immigration Judge sustained the charge of removability.[21]

Ndungu administratively appealed that decision to the Board of Immigration Appeals.  He disputed the Immigration Court's non-application of *res judicata* and its conclusion that his felony convictions for fleeing-or-eluding each constituted a CIMT.  The BIA affirmed the Immigration Court's ruling and issued a final order of removal.  But in so doing, the BIA did not cite 8 U.S.C. § 1227(a)(2)(A)(ii) as the basis for removability; instead, it repeatedly identified the charged basis for Ndungu's removal as § 1227(a)(2)(A)(i).  That subsection, subject to an exception not relevant here, authorizes the deportation of a non-citizen who, within five years of

---

[20] In addition to those defenses, Ndungu sought relief from removal.  He applied for cancellation of removal for lawful permanent residents, as well as for asylum, statutory withholding of removal, and protection under the Convention Against Torture.

[21] Through a separate order, the Immigration Judge denied Ndungu's requests for relief from removal.

admission, commits a CIMT punishable by at least one year in prison. *Id.* Nonetheless, the BIA conducted an analysis consistent with § 1227(a)(2)(A)(ii): it evaluated Ndungu's two convictions as potential predicate offenses under the categorical approach, and it did not focus on the timing or the potential punishments for the offenses – as would be necessary to sustain a removal charge under § 1227(a)(2)(A)(i).

Without success on administrative appeal, Ndungu filed a timely petition in this Court to review the BIA's final order of removal. *See* 8 U.S.C. § 1252(b)(1).

After the panel initially heard oral argument on the petition, the Court voted for en banc rehearing and requested supplemental briefing. After an en banc oral argument, the majority of active judges voted to remand the case to the panel for disposition.

## II. DISCUSSION

Congress, through a statutory provision referred to as the 'criminal-alien bar,'[22] has limited judicial review of final orders of removal for non-citizens convicted of certain types of crimes. That rule mandates that "no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed" identified offenses, including multiple CIMTs. 8 U.S.C. § 1252(a)(2)(C) (stripping courts of jurisdiction over, among other things, review of removal orders under 8 U.S.C. § 1227(a)(2)(A)(ii)); *see also id.* § 1227(a)(2)(A)(ii) (subjecting aliens who commit multiple separate CIMTs after admission to removal). But under an exception, the criminal-alien bar does not foreclose judicial review of constitutional claims or questions of law. *See id.* § 1252(a)(2)(D); *Patel v. Garland*, 596 U.S. 328, 339 (2022) (explaining that Section

---

[22] *See* 8 U.S.C. § 1252(a)(2)(C); *Nasrallah v. Barr*, 590 U.S. 573, 589 (2020) (Thomas, J., dissenting).

16

1252(a)(2)(D) "preserves review of constitutional claims and questions of law"); *Nasrallah v. Barr*, 590 U.S. 573, 581 (2020) ("[A] court of appeals may review constitutional or legal challenges to a final order of removal, but the court of appeals may not review factual challenges to a final order of removal." (emphasis omitted)); *Wilkinson v. Garland*, 601 U.S. 209, 221 (2024) (explaining that courts lack jurisdiction to review "factual findings").

In his petition, Ndungu argues that the agency erred as a matter of law in two respects: by rejecting the application of *res judicata* and by concluding that felony fleeing-or-eluding under Pennsylvania law is categorically a CIMT. As legal questions, those two issues are outside the criminal-alien bar and are within this Court's jurisdiction. *See Sasay*, 13 F.4th at 295–96; *Grijalva Martinez v. Att'y Gen.*, 978 F.3d 860, 864 n.2 (3d Cir. 2020).

### A. Administrative Claim Preclusion: An Agency's Application of *Res Judicata* to Its Own Prior Final Orders

Courts have developed the doctrines of *res judicata* (for claims) and collateral estoppel (for issues) that define the preclusive effects of their own final judgments on civil cases in subsequent civil suits. In creating federal agencies and empowering them with adjudicative functions, Congress is presumed to have "legislated with an expectation" not merely that agencies could determine the preclusive effect that they would afford to their own orders in future administrative proceedings but even more: that final agency orders would be presumed to have *res judicata* and collateral estoppel effects on later agency adjudications. *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991); *see Duvall v. Att'y Gen.*, 436 F.3d 382, 387 (3d Cir. 2006) ("Congress may be presumed, when enacting a statute granting to an agency

17

adjudicatory authority, to mandate adherence to the doctrine of collateral estoppel.").[23]

But that expectation imputed to Congress is not absolute. There cannot be administrative preclusion "when a statutory purpose to the contrary is evident." *Astoria*, 501 U.S. at 108 (quoting *Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783 (1952)). And administrative preclusion should not be applied under unsuitable circumstances, which depend on "the specific context of the rights at stake, the power of the agency, and the relative adequacy of agency procedures." *Id.* at 109–10.

Consistent with those principles, this Court has acknowledged the general applicability of administrative claim preclusion to final orders of removal. *See Duhaney v. Att'y Gen.*, 621 F.3d 340, 348 (3d Cir. 2010) (recognizing "the general proposition that *res judicata* may be applied to adjudicative proceedings under the INA"); *see also Johnson v. Ashcroft*, 378 F.3d 164, 172 n.10 (2d Cir. 2004) ("That *res judicata* does sometimes apply in immigration proceedings is unquestionable."). Still, this Court has refused to bar subsequent removal charges against a noncitizen who commits later crimes. *See Duvall*, 436 F.3d at 391 ("Legislative policy dictates that the bar against relitigation must drop when the alien continues to commit criminal acts after initial immigration proceedings."); *see also Astoria*, 501 U.S. at 109–10 (explaining that overcoming the presumption in favor of administrative preclusion requires only a contrary statutory purpose, not a clear statement).

---

[23] *But cf. B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 164–67 (2015) (Thomas, J., dissenting) (arguing against the presumption of administrative preclusion); *Johnson v. Whitehead*, 647 F.3d 120, 129 (4th Cir. 2011) (refusing, before the Supreme Court's *B & B Hardware* decision, to impose judicial rules of preclusion on an agency and applying, instead, the agency's own preclusion rules).

### 1. *The Agency's Rationale for Rejecting* Res Judicata

The Immigration Court analyzed Ndungu's *res judicata* argument using this Court's three-element formulation of that affirmative defense. One articulation of those elements is the following:

1. A final judgment on the merits in a prior suit;
2. A subsequent suit based on the same cause of action; and
3. Involvement of the same parties or their privies in both suits.

*See In re Mullarkey*, 536 F.3d 215, 225 (3d Cir. 2008). The Immigration Court also acknowledged that this Court takes a transactional approach to the same-cause-of-action requirement so that for removal proceedings, the relevant transaction is the "factual occurrence or conviction upon which a charge of removability is based." Decision of the Immigration Judge at 3 (JA22) (quoting *Duhaney*, 621 F.3d at 348–49).

The Immigration Court then evaluated whether the final order in Ndungu's 2017 removal proceedings had a preclusive effect. The Immigration Judge reasoned that the order lacked claim preclusive force because, despite being a ruling on the merits, the order terminated the proceedings "without considering whether the Fleeing or Attempting to Elude Officer conviction constituted a CIMT." *Id.*

On administrative appeal, the BIA adopted the entirety of the Immigration Judge's analysis of *res judicata* as its own, so the rationale in the Immigration Judge's decision is the object of judicial review. *See Garland v. Ming Dai*, 593 U.S. 357, 371 (2021) ("By adopting that analysis as its own, the BIA's decisional path . . . includes that analysis."); *Garcia v. Att'y Gen.*, 665 F.3d 496, 502 (3d Cir. 2011), *as amended* (Jan. 13, 2012) ("When the BIA adopts or defers to the underlying

19

decision of the IJ, we review the IJ's opinion as the decision of the agency.").

### 2. De Novo *Review of the Agency's Legal Conclusion*

In his present petition, Ndungu challenges that decision. He contends that because the Immigration Judge in the 2017 proceedings did not order his removal based on his 2014 fleeing-or-eluding conviction, DHS is barred from again relying on that conviction as grounds for removal. In making that argument, Ndungu asserts that in the 2019 proceedings, the Immigration Judge found only one elemental shortcoming in his *res judicata* defense – the final-judgment-on-the-merits requirement. According to Ndungu, that element was met because the order in the 2017 removal proceedings was a final judgment on the merits.

Even if it was of "less than ideal clarity,"[24] the agency's rationale was not so confined. The Immigration Judge also considered the same-cause-of-action requirement and explained that the relevant cause of action is the 'factual occurrence or conviction' underlying the charge of removability. And as a matter of law, because 8 U.S.C. § 1227(a)(2)(A)(ii) requires multiple CIMTs for removal, the relevant transaction for purposes of claim preclusion consists of the combination of the charged CIMTs in the removal proceedings. *See Duhaney*, 621 F.3d at 348 (describing the transactional approach). So, for Ndungu's 2017 removal proceedings, the relevant transaction for claim-preclusion purposes is the combination of Ndungu's 2014 fleeing-or-eluding conviction and his 2017 simple assault convictions. And absent an exception to administrative preclusion, the Immigration Court in a future proceeding cannot order

---

[24] *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).

Ndungu's removal on the ground that the combination of those two convictions satisfies § 1227(a)(2)(A)(ii).

But in charging Ndungu with removal in 2019, DHS did not rely on those same two convictions. Instead, it identified the predicate offenses as his 2014 and 2019 fleeing-or-eluding convictions. Thus, the cause of action in the 2019 removal proceedings is different from the cause of action in the 2017 proceedings.

Nonetheless, Ndungu insists that *res judicata* should apply. He focuses on the fact that the charges in both the 2017 and the 2019 proceedings relied on his 2014 fleeing-or-eluding conviction as a basis for removal. But a conviction for one CIMT does not by itself define the transaction for removal under § 1227(a)(2)(A)(ii), which requires multiple CIMTs for removal. Even more, DHS could not have charged Ndungu with removal based on the combination of his 2014 and his 2019 fleeing-or-eluding convictions at the time of his 2017 removal proceedings. *See Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 590 U.S. 405, 414 (2020) ("Claim preclusion generally does not bar claims that are predicated on events that postdate the filing of the initial complaint." (internal quotation omitted)); *In re Mullarkey*, 536 F.3d at 225 ("The doctrine of *res judicata* bars not only claims that were brought in a previous action, but also claims that could have been brought."). Thus, it is of no moment, at least for purposes of claim preclusion, that DHS had previously relied on Ndungu's 2014 fleeing-or-eluding conviction as one of the predicate offenses for removal. Instead, under a transactional view, the 2019 proceedings involved a different cause of action than the 2017 proceedings, so *res judicata* does not bar DHS from relying on Ndungu's 2014 fleeing-or-eluding conviction as a basis for removal in the 2019 proceedings.

21

**B. The Challenge under the Categorical Approach to the Predicate Fleeing-or-Eluding Offenses as Crimes Involving Moral Turpitude**

Ndungu also challenges the agency's legal conclusion that his two convictions for felony fleeing-or-eluding qualify as CIMTs. In upholding the ruling of the Immigration Court, the BIA relied on a realistic-probability exception to the categorial approach by reasoning with respect to Ndungu's two felony fleeing-or-eluding convictions that "the minimum conduct [for which Ndungu] has a realistic probability of being prosecuted under the statute entails 'reprehensible conduct' to warrant treatment as a CIMT." BIA Decision at 2 (JA6) (quoting *Acosta*, 27 I. & N. Dec. 420, 422 (B.I.A. 2018)). As explained below, that conclusion is incorrect: it misapprehends this Court's formulation of the realistic-probability exception.

*1. The BIA Misconstrued Circuit Precedent for the Realistic-Probability Exception to the Categorical Approach.*

The Supreme Court has articulated two strands of realistic-probability considerations that bear on the categorical approach.

First, in *Gonzales v. Duenas-Alvarez*, 549 U.S. 183 (2007), the Supreme Court explained that realistic-probability considerations could negate an elemental match under the categorical approach. *Id.* at 193. Even when the elements of a state offense categorically match those of a federal offense, a categorical mismatch is possible if there is "a realistic probability, not a theoretical possibility, that the State would apply its statute to conduct that falls outside the generic definition of a crime." *Id.* So, under *Duenas-Alvarez*, a match between the elements of a state offense and those in the federal standard does not satisfy the categorical approach if there is a realistic probability that the state would construe its offense to reach conduct outside of the federal standard. Although it was

not necessary in *Duenas-Alvarez* or in either of the Supreme Court's two subsequent decisions referencing realistic-probability considerations, *Moncrieffe v. Holder*, 569 U.S. 184 (2013), and *United States v. Taylor*, 596 U.S. 845 (2022), to apply those considerations, they are permitted under the categorical approach.

Second, the *Moncrieffe* decision, in addition to reaffirming the legitimacy of the *Duenas-Alvarez* realistic-probability considerations, identified a distinct use of those considerations, as a means of preserving a categorical match. *Moncrieffe*, 569 U.S. at 191. For context, as part of an *in terrorem* argument, the Government contended that state offenses that would otherwise categorically match a federal standard may no longer do so when there are exceptions to the federal standard. *Id.* at 205–06. In particular, the Government identified the antique-firearms exception to federal gun prohibitions, *see* 18 U.S.C. § 921(a)(3), and argued that for a state firearms offense to categorically match the federal aggravated felony standard, which allows for removal based on firearms offenses, *see* 8 U.S.C. § 1101(a)(43)(C); *id.* § 1227(a)(2)(A)(iii), the state firearms offense must also have an exception for antique firearms. *Moncrieffe*, 569 U.S. at 205–06. From a purely formalistic perspective, the Government's argument had real traction. But in rejecting the government's position, the Supreme Court invoked realistic-probability considerations, so that only when there was a realistic probability that a state would interpret its laws to criminalize conduct within the antique-firearms exception would that exception negate categorical matching. *Id.* at 206 ("To defeat the categorical comparison in this manner, a noncitizen would have to demonstrate that the State actually prosecutes the relevant offense in cases involving antique firearms.").

To obtain a categorical match between Ndungu's state offenses and a CIMT, the BIA relied on a distinct variation of realistic-probability considerations. It examined whether "the minimum conduct [for which Ndungu had] a realistic

probability of being prosecuted under the statute entails 'reprehensible conduct' to warrant treatment as a CIMT." BIA Decision at 2 (JA6) (quoting *Acosta*, 27 I. & N. Dec. at 422). But this Court has not applied realistic-probability considerations that way. In *Singh v. Attorney General*, 839 F.3d 273 (3d Cir. 2016), this Court recognized that in both *Duenas-Alvarez* and *Moncrieffe*, the elements of the state crime and its counterpart federal offense were identical. *Id.* at 286 n.10. And on that ground, *Singh* limited the realistic-probability analysis to instances in which the elements of the state crime and the federal offense were identical. *Id.* Subsequent cases have followed that narrow application of realistic-probability principles. *See Salmoran v. Att'y Gen.*, 909 F.3d 73, 81 (3d Cir. 2018) (recognizing that this Court's precedent "takes [an] alternative approach" in which the realistic probability analysis in *Moncrieffe* does not apply unless the elements of the state and federal offenses were identical); *Zhi Fei Liao v. Att'y Gen.*, 910 F.3d 714, 724 (3d Cir. 2018) (declining to apply a realistic probability analysis when the elements of the offense "leave nothing to the legal imagination" (internal quotation omitted)); *see also United States v. Jenkins*, 68 F.4th 148, 154 (3d Cir. 2023); *Cabeda v. Att'y Gen.*, 971 F.3d 165, 176 (3d Cir. 2020).

Rather than abide by that limitation, the BIA applied realistic-probability considerations as a means of arriving at a categorical match – not to negate or preserve a preexisting match. Accordingly, it was not permissible for the BIA to rely on realistic-probability considerations as it did. *See Salmoran*, 909 F.3d at 81; *see also Jean-Louis*, 582 F.3d at 481 (seriously doubting, pre-*Moncrieffe*, that "the logic of the Supreme Court in *Duenas-Alvarez* . . . is transferable to the CIMT context"). For that reason, under this Court's precedent, the BIA erred in its application of the categorical approach.

### 2. *Ndungu's Fleeing-or-Eluding Convictions Do Not Qualify as CIMTs.*

Ordinarily, an agency's error in formulating the correct legal standard for one of its orders is a basis for vacating and remanding. *See Fed. Power Comm'n v. Idaho Power Co.*, 344 U.S. 17, 20 (1952) (recognizing the general appropriateness of a remand to an agency once "an error of law is laid bare" by a reviewing court). But when a remand would be futile, it is unnecessary. *See Vurimindi v. Att'y Gen.*, 46 F.4th 134, 140 (3d Cir. 2022). To be futile, the issue for potential remand must involve a "purely legal question" that "does not implicate the agency's expertise," does not require factfinding, and receives *de novo* review. *Id.*

The question presented here asks whether Ndungu's fleeing-or-eluding convictions constitute CIMTs under the categorical approach. The scope of that issue, which is already circumscribed by the criminal-alien bar, 8 U.S.C. § 1252(a)(2)(C), satisfies the criteria for futility, so that it may be examined now without the need for an antecedent remand.

### a. <u>The Scope of Fact-Finding Under the Categorical Approach Is Limited to Determining the Elements of the Offense of Conviction.</u>

Although the categorial approach does not involve any consideration of the factual basis for a prior conviction, identifying the offense of conviction is essential to the categorical matching process. And it is permissible for a tribunal to ascertain factually the offense of conviction. *See Pereida*, 592 U.S. at 238 ("When applying the categorical approach, this Court has long acknowledged that to ask what crime the defendant was convicted of committing is to ask a question of fact.").

25

When a statute is 'indivisible,' meaning that it criminalizes only a single set of elements, that factual inquiry involves nothing more than the identification of the statute of conviction. *Id.* at 234–35 ("Some statutes state only a single crime, often making it a simple thing for a judge to conclude from a defendant's criminal records that he was convicted of violating statute x and thus necessarily convicted of crime x.").

But when a statute is 'divisible,' meaning that it provides separate, alternative elements for a criminal offense, the statutory basis of the conviction does not conclusively identify the elements of the conviction. *See Descamps v. United States*, 570 U.S. 254, 262 (2013) (explaining that a statute is divisible when it provides "multiple, alternative versions of the crime"); *see also Mathis*, 579 U.S. at 505–06. In that situation, it is permissible for a tribunal to make a factual inquiry into the precise elemental formulation of the offense of conviction. *See Descamps*, 570 U.S. at 263.

> b. *The Pennsylvania Felony of Vehicular Fleeing or Attempting to Elude Law Enforcement Is Divisible in Two Respects.*
>
>     i. The Structural Components of 75 Pa. Cons. Stat. § 3733

Section 3733, the statute under which Ndungu was twice convicted for felony fleeing-or-eluding, has two relevant components: the definition of the offense and its grading factors (also referred to as 'aggravating factors').

The offense is defined at the beginning of subsection (a) of the statute. 75 Pa. Cons. Stat. § 3733(a). Grammatically, that definition consists of a subject followed by two disjunctive adjectival clauses and one adverbial phrase:

26

> Any driver of a motor vehicle who willfully fails or refuses to bring his vehicle to a stop, or who otherwise flees or attempts to elude a pursuing police officer, when given a visual and audible signal to bring the vehicle to a stop . . . .

*Id.* The subject is "[a]ny driver," and it is modified by the prepositional phrase "of a motor vehicle." *Id.* The two adjectival clauses that follow each begin with the relative pronoun 'who': "who willfully fails or refuses to bring his vehicle to a stop" and "who otherwise flees or attempts to elude a pursuing police officer." *Id.*[25] The next phrase is adverbial – "when given a visual and audible signal to bring the vehicle to a stop" – and it modifies the verbs in each of the adjectival clauses. *Id.*[26]

In terms of punishment, § 3733 allows the offense to be either a misdemeanor or a felony. *See United States v. Jones*, 740 F.3d 127, 131 (3d Cir. 2014). In the absence of any aggravating factors, the offense is a second-degree

---

[25] In construing the second adjectival clause, the Superior Court of Pennsylvania has held that the phrase "a pursuing police officer" modifies only "attempts to elude" and not "otherwise flees" (or any of the content in the first adjectival clause). *Commonwealth v. Wise*, 171 A.3d 784, 789–90 (Pa. Super. Ct. 2017). That interpretation relied on the rule of the last antecedent, and it carries the consequence of construing the verb 'flees' intransitively, such that the object 'a pursuing police officer' is not needed to complete its meaning. *Flee*, *Webster's Third New International Dictionary* (1961) (defining flee as both a transitive and an intransitive verb); *Flee*, *American Heritage Dictionary of the English Language* (1st ed. 1969) (same).

[26] Subsection (b) of the statute makes clear that the referenced "visual and audible signal to bring the vehicle to a stop" must be "given by [a] police officer." 75 Pa. Cons. Stat. § 3733(b).

misdemeanor. 75 Pa. Cons. Stat. § 3733(a.2)(1); *see also* 18 Pa. Cons. Stat. § 1104(2) (defining penalties for a second-degree misdemeanor). But if the offense is committed while the driver is under the influence, crosses state lines, or endangers law enforcement or a member of the public, then it is a third-degree felony:

> An offense under subsection (a) constitutes a felony of the third degree if the driver while fleeing or attempting to elude a police officer does any of the following:
>
> (i)     commits a violation of section 3802 (relating to driving under influence of alcohol or controlled substance);
>
> (ii)    crosses a State line; or
>
> (iii)   endangers a law enforcement officer or member of the general public due to the driver engaging in a high-speed chase.

75 Pa. Cons. Stat. § 3733(a.2); *see also* 18 Pa. Cons. Stat. § 1103(3) (defining penalties for a third-degree felony).[27]

Each of the three aggravating factors is subject to a condition – they must occur while the driver is "fleeing or

---

[27] Section 3733 also provides two defenses. The first exonerates fleeing or attempting to elude a pursuing unmarked police vehicle. *See* 75 Pa. Cons. Stat. § 3733(c)(1). The second exempts conduct otherwise criminalized by the statute if the driver establishes that the reason for not immediately stopping was "a good faith concern for personal safety." *Id.* § 3733(c)(2) (identifying a non-exhaustive list of factors that may be considered to evaluate the applicability of the defense).

attempting to elude a police officer."[28]   75 Pa. Cons. Stat. § 3733(a.2)(2).   In context, the term 'fleeing' is best understood to encompass all forms of fleeing, including failing or refusing to stop a vehicle.  That is so because in defining the underlying offense, subsection (a) relies on two adjectival clauses, and the second one, "who otherwise flees," operates in relation to the first clause through the term 'otherwise.'  *Id.* § 3733(a).   And by using that word, which means "in a different way or manner" or "in different circumstances,"[29] the second adjectival clause indicates that the conduct described in the first clause also constitutes 'fleeing.'[30]  Accordingly, the condition for the felony offense is satisfied by any form of fleeing – including willfully failing or refusing to stop a vehicle in response to a signal to stop – as well as by an attempt to elude a pursuing police officer.

---

[28] Unlike the first adjectival clause defining the underlying offense, *see* 75 Pa. Cons. Stat. § 3733(a), the grading condition does not require a *pursuing* police officer, *see id.* § 3733(a.2)(2).

[29] *Otherwise*, *Webster's Third New International Dictionary* (1961); *see also Otherwise*, *American Heritage Dictionary of the English Language* (1st ed. 1969); *cf. Holland v. Rosen*, 895 F.3d 272, 290 (3d Cir. 2018); *Alcoa, Inc. v. United States*, 509 F.3d 173, 181 (3d Cir. 2007).

[30] Under the consistent-meaning canon, the term 'fleeing' as used in the grading condition would receive the same meaning – either as a transitive verb or as an intransitive verb – as it has when used in defining the underlying offense.  *See Nat'l Credit Union Admin. v. First Nat. Bank & Tr. Co.*, 522 U.S. 479, 501 (1998) ("[T]he established canon of construction [provides] that similar language contained within the same section of a statute must be accorded a consistent meaning.").

### ii. The Dual Divisibility of § 3733

From its structure, § 3733 is divisible along two axes: between the misdemeanor and the felony subsections and then within the felony subsection between the three aggravating factors.

The divisibility between the misdemeanor and felony subsections results from the different punishments imposed by those subsections. As a matter of law, if proof of one fact increases the statutory maximum sentence (or the mandatory minimum sentence), it is an element of an offense. *See Mathis*, 579 U.S. at 518 ("If statutory alternatives carry different punishments, then under *Apprendi* they must be elements."); *see also Apprendi v. New Jersey*, 530 U.S. 466, 483 n.10 (2000) ("[F]acts that expose a defendant to a punishment greater than that otherwise legally prescribed were by definition 'elements' of a separate legal offense."); *Alleyne v. United States*, 570 U.S. 99, 108 (2013) ("*Apprendi*'s definition of 'elements' necessarily includes not only facts that increase the ceiling, but also those that increase the floor."). And under subsection (a.2) of § 3733, proof of any of the fleeing-or-eluding grading factors subjects an offender to a felony conviction instead of a misdemeanor. So those factors, as a set, are elementally separate from the misdemeanor offense, making the statute divisible in that respect.

Section 3733 is also divisible between the different aggravating factors. Even though each grading factor carries the same potential penalty, that alone does not render divisibility impossible. Rather, in assessing the divisibility of state criminal statutes, federal courts defer to constructions of the statute provided by an "authoritative source[] of state law." *Mathis*, 579 U.S. at 518; *see also Singh*, 839 F.3d at 283 ("When a ruling from an 'authoritative source[] of state law' resolving this means-or-elements question 'exists, a . . . judge need only follow what it says.'" (alterations in original) (quoting *Mathis*, 579 U.S. at 518)). A ruling from the highest

30

court in a state carries that weight, as does a ruling from an intermediate state appellate court in the absence of "persuasive data that the highest court of the state would decide otherwise." *Singh*, 839 F.3d at 283 n.5; *see also Pesikan v. Att'y Gen.*, 83 F.4th 222, 228 (3d Cir. 2023). Under that standard, a ruling by the Superior Court of Pennsylvania is ordinarily an authoritative source of Pennsylvania state law. *See Singh*, 839 F.3d at 283 n.5. And in *Commonwealth v. Bowen*, 55 A.3d 1254 (Pa. Super. Ct. 2012), the Superior Court explained that in amending the statute in 2006, the Pennsylvania General Assembly "created a new, aggravated version of the offense . . . [that] introduced additional *elements* which must be proven beyond a reasonable doubt and graded the offense as a felony." *Id.* at 1268 (emphasis added); *see also Commonwealth v. Moffitt*, 305 A.3d 1095, 1101–02 (Pa. Super. Ct. 2023) (treating the grading factors in § 3733(a.2) as separate elements). Treating that holding as authoritative, § 3733 is divisible between the grading factors.

Ndungu contests the second axis of § 3733's divisibility. He argues that under Pennsylvania law, the felony grading factors are not elements. But he cannot overcome the Superior Court's resolution of that issue: the grading factors in § 3733 are separate elements. *See Bowen*, 55 A.3d at 1268. Nor does he provide persuasive data that the Supreme Court of Pennsylvania would reach a different outcome on this issue.

To the contrary, the model jury instructions for Pennsylvania align with the Superior Court's holding. Those instructions, although not binding on Pennsylvania courts, may be considered as persuasive authority in the divisibility analysis. *See Vurimindi*, 46 F.4th at 147 & n.10; *see also Pesikan*, 83 F.4th at 229–30 & n.11. For § 3733, the model instructions require that a jury identify the specific grading factors that served as the basis for the felony conviction. Pennsylvania Suggested Standard Criminal Jury Instructions, Pa. SSJI (Crim), § 17.3733. Yet identifying the applicable grading factor with specificity would be unnecessary if the

31

factors were merely *means* of committing a felony offense, because a jury does not have to agree on the means by which an offense was committed, only its elements. *See Mathis*, 579 U.S. at 506 ("Because that kind of list merely specifies diverse means of satisfying a single element of a single crime – or otherwise said, spells out various factual ways of committing some component of the offense – a jury need not find (or a defendant admit) any particular item . . . ."); *Descamps*, 570 U.S. at 286 (Alito, J., dissenting) ("The feature that distinguishes elements and means is the need for juror agreement . . . ."). So, if the grading factors in subsection (a.2) were merely means, then it would suffice if four jurors found guilt under only grading factor (i), four under only grading factor (ii), and four under only grading factor (iii). *See Taylor*, 596 U.S. at 859 n.3 ("[A] jury need unanimously conclude only that the defendant used one of the listed means; it need not agree on which one."). However, by instructing the jury to indicate the precise grading factor on which the verdict depends, the model jury instructions suggest that each grading factor is a separate element. *See Apprendi*, 530 U.S. at 477; *United States v. Ramos*, 892 F.3d 599, 608 (3d Cir. 2018) ("Each alternative offense listed in a divisible statute must be proven beyond a reasonable doubt to sustain a conviction."). With the model jury instructions cutting against his position, Ndungu fails to provide a persuasive basis for disregarding the Superior Court's determination that the grading factors constitute distinct elements of the felony fleeing-or-eluding offense.

      c. <u>The Elements of Grading Factor (iii) Do Not Categorically Match the Elements of a Crime Involving Moral Turpitude.</u>

Although the categorical approach permits courts to determine the precise offense of conviction, courts do not have free rein to consider any and all information in that fact-finding endeavor. *See Taylor*, 495 U.S. at 601 (inferring from legislative silence that Congress did not intend "an elaborate

factfinding process regarding the defendant's prior offenses" as part of the categorical approach); *Shepard v. United States*, 544 U.S. 13, 16 (2005) (holding that courts may not consider police reports and criminal complaint applications in determining the offense of conviction under the categorical approach); *Ramos*, 892 F.3d at 607 (explaining that although courts may "look beyond the text of a divisible statute" to determine the specific statutory section that "provided the basis for the prior conviction," they may not "scour the record to ascertain the factual conduct giving rise to the prior conviction"). Instead, courts may consider a limited set of judicial records, often referred to as '*Shepard* documents,' to determine the offense of conviction. *See Shepard*, 544 U.S. at 16, 26 (listing documents that may be considered in the context of a guilty plea and permitting consideration of any "comparable judicial record of this information"). Those include the charging documents, jury instructions, a written plea agreement, transcripts of any plea colloquy, any explicit factual findings made by the court to which the defendant assented, and verdict slips. *See Nijhawan*, 557 U.S. at 41–42 (recognizing as *Shepard* documents the charging documents, plea agreements, transcripts of plea colloquies, findings of fact and conclusions of law from a bench trial, jury instructions, and verdict forms); *see also Vurimindi*, 46 F.4th at 142 n.4. In addition, in the immigration context, it is statutorily permissible to consider other categories of documents to determine the precise offense of conviction. *See* 8 U.S.C. § 1229a(c)(3)(B); *see also Pereida*, 592 U.S. at 231–32; *Ali v. Mukasey*, 521 F.3d 737, 742 (7th Cir. 2008). Those documents include the official minutes of court proceedings, 8 U.S.C. § 1229a(c)(3)(B)(iv), and "[a]ny document or record attesting to the conviction that is maintained by an official of a State or Federal penal institution, which is the basis for that institution's authority to assume custody of the individual named in the record[,]" *id.* § 1229a(c)(3)(B)(vii).

When a court engages in this fact-finding to identify the precise elements of a conviction pursuant to a divisible statute,

33

it is said to engage in the modified categorical approach. In that situation, the conclusiveness of the *Shepard* and other statutorily permitted documents determines the scope of the categorical matching analysis. If those documents indicate which of the alternative elemental formulations of the offense was the legal basis for the conviction, then only that identified alternative needs to be evaluated categorically. *See Descamps*, 570 U.S. at 263 ("Applied in that way – which is the only way we have ever allowed – the modified approach merely helps implement the categorical approach when a defendant was convicted of violating a divisible statute."). But if the *Shepard* and other statutorily permitted documents cannot identify which of the alternative elemental formulations of the offense was the basis for the conviction, then each of the alternatives cannot be ruled out as the grounds for the conviction, and the conviction must be examined categorically. *See Pereida*, 592 U.S. at 240 (explaining where the *Shepard* documents are unclear the government must "show that *all* of the statute's offenses [meet] the federal definition" (emphasis in original)); *cf. United States v. Peppers*, 899 F.3d 211, 232 (3d Cir. 2018) (explaining that "[w]ithout *Shepard* documents, the categorical and modified categorical approaches are the same," so that the categorical approach must be applied to each subsection of a divisible statute).

In this case, the agency's fact-finding under the modified categorical approach was able to identify the precise subsection for Ndungu's 2014 conviction but not for his 2019 conviction. In reviewing the criminal information, which is a *Shepard* document (but not one of the additional statutorily identified sources),[31] the Immigration Court found that Ndungu's 2014 conviction for felony fleeing-or-eluding was

---

[31] *See Evanson v. Att'y Gen.*, 550 F.3d 284, 292–93 (3d Cir. 2008) (explaining that under Pennsylvania law, a criminal information replaces a criminal complaint as charging document); *see also Nijhawan*, 557 U.S. at 41 (recognizing charging documents are *Shepard* documents).

34

for endangering others due to a high-speed chase pursuant to grading factor (iii) of § 3733(a.2)(2). *See* 75 Pa. Cons. Stat. § 3733(a.2)(2)(iii). The Immigration Court, however, could not divine the same clarity from the documents related to Ndungu's 2019 fleeing-or-eluding conviction, and therefore it could not determine the precise grading factor of the felony conviction.[32] On administrative appeal, the BIA did not disturb either of those findings.

With this Court's jurisdiction circumscribed by the criminal-alien bar, the agency's factual findings control the scope of the categorical matching analysis. The finding that the 2014 conviction was pursuant to grading factor (iii) of § 3733(a.2)(2) means that for that conviction to qualify as a CIMT, that crime must satisfy the two CIMT elements. But a lack of precise records for Ndungu's 2019 conviction means that for felony offenses under § 3733, each of the three grading factors must categorically match the two CIMT elements. And because that 2019 conviction must qualify as a CIMT to sustain removal under 8 U.S.C. § 1227(a)(2)(A)(ii),[33] the agency's

---

[32] Although the criminal information for the 2019 conviction identified the intersection at which the offense occurred, which was approximately thirty miles from the nearest state line, the Immigration Court did not consider that and did not exclude subsection (a.2), which relates to fleeing or eluding across state lines, as the offense of conviction. But this Court cannot revisit the agency's factual findings regarding the precise offense of conviction because the criminal-alien bar imposes a jurisdictional limitation that prevents a reviewing court from reevaluating pure questions of fact decided by an agency, *see* 8 U.S.C. § 1252(a)(2)(C); *Patel*, 596 U.S. at 339; *Nasrallah*, 590 U.S. at 579.

[33] Ndungu also argues that the BIA erred by citing the wrong subsection – § 1227(a)(2)(A)(i), not § 1227(a)(2)(A)(ii) – as the basis for removal. That was a scrivener's error that in this context was harmless because the BIA conducted a legal analysis as if the basis for removal were § 1227(a)(2)(A)(ii).

final order of removal can be upheld only if each of the three grading factors categorically match the two CIMT elements.  It is unnecessary, however, to conduct the full categorical analysis for each grading factor if any of them fails to qualify as a CIMT.  And here, grading factor (iii) is a potentially efficient starting point for the analysis in part because both of Ndungu's § 3733 convictions require categorical matching between that grading factor and the CIMT elements.

Much of the culpable conduct under grading factor (iii) of § 3733(a.2)(2) satisfies the first CIMT element, a reprehensible act.  As this Court has previously recognized, "all" of the conduct criminalized under § 3733(a) involves "intentional disobedience of a command from law enforcement while in a vehicle." *Jones*, 740 F.3d at 134; *cf. Sykes v. United States*, 564 U.S. 1, 9 (2011), *overruled on other grounds by Johnson v. United States*, 576 U.S. 591 (2015) ("The attempt to elude capture is a direct challenge to an officer's authority.  It is a provocative and dangerous act . . . .").  And endangering a law enforcement officer or a member of the public will typically breach "the duties owed to other persons, either individually or to society in general." *Larios*, 978 F.3d at 69 (quotation omitted); *cf. Sykes*, 564 U.S. at 10 (explaining that vehicle flight "presents more certain risk [of violence] as a categorical matter than burglary").

But under the categorical approach, it does not matter that *most* occasions of criminal conduct under a statute would qualify as a CIMT – *every* instance must do so. *See Taylor*, 596 U.S. at 857–58; *United States v. Brasby*, 61 F.4th 127, 135 (3d Cir. 2023).  And the conduct criminalized under grading factor (iii) of § 3733 – "endanger[ing] a law enforcement officer or member of the general public due to the driver engaging in a high-speed chase," 75 Pa. Cons. Stat.

*See generally* 5 U.S.C. § 706 (providing that for review of agency action "due account shall be taken of the rule of prejudicial error").

36

§ 3733(a.2)(2)(iii) – includes recklessly fleeing or attempting to elude a law enforcement officer based on a good-faith belief in the need for emergency medical care.[34] Thus, a driver who recklessly flees or attempts to elude law enforcement in an attempt to transport himself or another person to a hospital would still violate the statute. But it is not reprehensible to prioritize a good-faith desire to obtain emergency medical treatment over the duty to reduce the risk to others by not refraining from a high-speed chase – even if such a chase involves dangers beyond those ordinarily associated with high-speed driving. *See In re R.C.Y.*, 27 A.3d 227, 230 (Pa. Super. Ct. 2011) (explaining that based on its legislative history, the grading factor (iii) aggravating factor applies "only in cases where the defendant's actions created an extraordinary danger to the public at large or to police officers"). And reprehensible conduct is needed for an offense to be a CIMT. So, even though there may be no realistic probability of prosecution for fleeing or eluding under those circumstances, that act, although still criminal but not reprehensible, prevents a conviction under grading factor (iii) of § 3733(a.2)(2) from qualifying as a CIMT under the categorical approach.

In sum, without revisiting any of the agency's factual findings, *de novo* review of the pure legal question of

---

[34] A mental state of recklessness may apply to grading factor (iii) by virtue of a Pennsylvania statute, referred to as a 'gap-filling provision,' which allows a material element to be satisfied by an intentional, knowing, or reckless mental state when a mental state is not otherwise specifically associated with the *actus reus*. *See* 18 Pa. Cons. Stat. § 302(c); *see generally id.* § 302(c) ("When the culpability sufficient to establish a material element of an offense is not prescribed by law, such element is established if a person acts intentionally, knowingly or recklessly with respect thereto."); *Cabeda*, 971 F.3d at 174 n.9 (explaining that Pennsylvania's gap-filling provision provides alternative means, not elements, for an offense).

categorical matching reveals that the agency erred as a matter of law in ordering Ndungu's removal.  Because the fleeing-or-eluding offense under grading factor (iii) is not a CIMT under the categorical approach, neither of Ndungu's felony fleeing-or-eluding convictions qualifies as a predicate offense for removal under 8 U.S.C § 1227(a)(2)(A)(ii).

## III.   CONCLUSION

For the foregoing reasons, we will grant the petition.